[Civ. No. 18934.   Second Dist., Div. Three.   Jan. 21, 1953.]

STILLMAN POND, INC. et al., Appellants v. D. D. WAT-
SON, as Real Estate Commissioner, etc., Respondent.

Sprague & Sparks for Appellants.

Edmund G. Brown, Attorney General, and Lee B. Stanton, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Heber Stillman Pond, individually, and Stillman Pond, Inc., Heber Stillman Pond, president, held real estate brokers' licenses. (The corporation was licensed to act as such broker through its president, Heber Stillman Pond.) In an accusation, filed by a deputy real estate commissioner, they were charged in 12 counts with violating their legal duties as such licensees. In a supplemental accusation they were charged with three additional counts of such violations. After a hearing the Real Estate Commissioner found that six counts of the accusation and two counts of the supplemental accusation were true. He revoked the licenses. The other counts were dismissed.

The licensees petitioned the superior court for a writ of mandate compelling the commissioner to vacate his order revoking the licenses. The matter was submitted upon the record of the proceedings before the commissioner. The petition was denied, and the licensees appeal from the judgment.

The trial court found that the findings of the commissioner are supported by the evidence.

One of the charges (No. 2), which the commissioner found to be true, was that in October, 1950, the licensee sold, for Mr. and Mrs. Rite, a certain lot near Lancaster for $795 upon an agreement that the licensees were to receive as commission 5 per cent of the purchase price up to $700 and 50 per cent on any amount over $700, or a commission of $82.50, and that the licensees unlawfully withheld and commingled $250 and refused to pay to sellers $167.50 to which they were entitled; that said acts of the licensees were in violation of sections 10176(e),[1] 10176(i)[1] and 10177(d)[2] of the Business and Professions Code.

Appellants (licensees) contend that the evidence does not support the findings of the court (with reference to the Rite transaction) that they dishonestly neglected to place the $250 in a neutral depository but instead commingled it with their own money; that they neglected to inform the Rites that appellants customarily charge 10 per cent commission on the sale of unimproved property; and that they dishonestly claimed they were entitled to a 10 per cent commission. They argue that the only evidence as to commingling the deposit money is the testimony of Mrs. Rite that she could not say definitely whether the check she finally received from Pond was his personal check. Pond sold the lot in October, 1950, and received a deposit of $250. The escrow was closed in December, 1950, and the Rites received the money due them from the escrow. The Rites demanded on several occasions that Pond pay the deposit money that was due to them, and he promised to pay, but he did not pay until March 20, 1951. Section 2830 of the Administrative Code, title 10, provides that every real estate broker, who does not immediately place all funds entrusted to him by his principal or others in a neutral escrow depository or in the hands of principals, shall maintain a trust fund account with some bank or recognized depository and place all such entrusted funds therein upon receipt. Section 2832 of said code provides that the failure

---

[1]Section 10176 provides: "The commissioner may . . . revoke a real estate license . . . where the licensee . . . has been guilty of . . . (e) Commingling the money . . . of his principal with his own. . . . (i) Any other conduct . . . which constitutes fraud or dishonest dealing."

[2]Section 10177 provides: "The commissioner may . . . revoke the license of any real estate licensee, who . . . has . . . (d) Wilfully . . . violated any of the provisions of this part relating to real estate. . . ."

to maintain a trust fund account when required and to deposit trust funds received promptly in said account may be construed to be commingling in violation of section 10176(e) of the Real Estate Law. ▆▆▆ When Pond, as a witness on cross-examination, was asked what he did with the money he received as a deposit on the sale of the Rites' lot, he refused to answer on the ground that answering the question would tend to incriminate him. One of the issues was whether Pond commingled the deposit money with his money. The question which he refused to answer related directly to that issue. An inference could be drawn from his refusal to answer said question that he did not immediately place the deposit money in a neutral escrow depository or in the hands of principals or maintain a trust fund account with a bank or a recognized depository. (See *Fross* v. *Wotton*, 3 Cal.2d 384, 395 [44 P.2d 350].) It is to be noted that Pond testified, with reference to funds that he kept for construction purposes, that he kept some of them in his pocket and "I don't do business with any bank of any kind." There were six unsatisfied judgments for money against Pond, the amounts of which ranged from approximately $3,700 to approximately $9,400. The evidence supported the finding that appellants commingled the deposit money in violation of section 10176(e) of the Business and Professions Code.

▆▆▆ Appellants argue, with reference to their claim for 10 per cent commission, that there was an honest dispute as to the commission arrangement. Mrs. Rite testified that Pond said that the commission would be 5 per cent up to $700 and 50 per cent on any amount over $700. The selling price was $795. Under a 5 per cent commission, he would have been entitled to $82.50. On the basis of the 10 per cent commission, claimed by Pond, the commission would have been $117.50. The difference between the amounts of commission, on the basis of 5 per cent and the basis of 10 per cent, was $35. Although Pond conceded that the Rites were entitled, at least, to $132.50 of the deposit money, he held all the deposit money, $250, for approximately five months because he was claiming $35 more than 5 per cent commission. The findings to the effect that appellants did not inform the Rites that the commission would be 10 per cent, and that appellants dishonestly claimed 10 per cent commission, are supported by the evidence.

Another charge (No. 3), which the commissioner found to be true, was that about June 13, 1950, the licensees fraudulently induced Mr. and Mrs. Gately to buy a lot near Lan-

caster in Golden West Ranchos, and fraudulently represented that they would build a chicken house, and would furnish a new well and pump and "chicks and feed," without additional cost to the buyers; that the buyers relying upon such representations gave appellants a deposit of $750, and continued to make payments of $25 per month to appellants until December, 1950; that no escrow was opened until December, 1950, and the said promises of the licensees were never fulfilled; that said acts of the licensees were in violation of sections 10176(b),[3] 10176(e), and 10176(i) of the Business and Professions Code.

Another charge (No. 7), which the commissioner found to be true, was that in said Gately transaction the licensees accepted a deposit from said buyers to be applied upon the purchase of said lot, and that prior to the acceptance of said deposit the licensees did not give the buyers a copy of the commissioner's public report; that said actions of the licensees were in violation of the Rules and Regulations of the Real Estate Commissioner as provided in section 2795 of the Administrative Code.

■ Appellants contend that the evidence does not support the findings of the court to the effect that Pond was not the owner of the Golden West Ranchos. They argue that Pond was the owner of the Ranchos, that as owner he sold the lot to the Gatelys, and as owner he was not acting as a real estate agent. The commissioner's public report filed April 17, 1950, relating to the Ranchos, shows that on February 15, 1950, the title to said property was vested in Walter W. Middlecoff and Ralph A. Mochel. Middlecoff reported to the commissioner, by letter, on March 5, 1951, that on June 13, 1950, he and Mochel gave a contract to Helen F. Blackburn to sell said property to her, but she sold no lots and on February 15, 1951, she delivered to Middlecoff a quitclaim deed to said property; and that on February 23, 1951, Mochel conveyed his interest in the property to Middlecoff. Pond testified that Helen F. Blackburn was his nominee; that he had not issued any deed in connection with the property; and that Middlecoff issued some of the deeds, and Mochel issued some of the deeds, when Pond sold property in that tract. Middlecoff reported to the commissioner, by letter, on May 5, 1951,

---

[3]Section 10176 provides: "The commissioner may . . . revoke a real estate license . . . where the licensee . . . has been guilty of . . . (b) Making any false promises of a character likely to influence, persuade or induce."

that he has no contracts with Pond, except Pond has a mere nonexclusive permission to bring customers, without obligation as to commission except as may be agreed upon when a sale is made. Stillman Pond signed the deposit agreement as a real estate broker. The finding that Pond was not the owner is supported by the evidence.

Appellants also contend, with reference to the Gately transaction, that the evidence does not support the finding that appellants made said representations, regarding proposed improvements, without any intention of carrying them into effect. They argue that the deposit agreement did not specify a time within which the improvements were to be built; that, according to Pond's testimony, he was not to make the improvements until the Gatelys had paid $2,000 down; that the fact the improvements were not made does not justify a conclusion that he did not intend to make the improvements. The Gatelys made a deposit of $750 on June 13, 1950, and paid $25 each month thereafter until December, 1950. No improvement of the property was commenced. Mrs. Gately testified that Pond said the well would be put in immediately; the balance of the $2,000 was to be paid on March 15, 1951, when Pond was to have the improvements ready. In October, 1950, the Gately demanded that an escrow be opened and that the money they had paid be deposited therein. About November, 1950, Pond started an escrow but instructions were not signed. The $875 which the Gatelys had paid was not put into escrow. The finding to the effect that Pond did not intend to make the improvements is supported by the evidence.

Appellants also contend, regarding the Gately transaction, that the finding that they commingled the Gately money with their own money is not supported by the evidence. As above stated, the money was not placed in escrow. When Pond, as a witness, was asked what he did with the Gately money he refused to answer on the ground that answering the question would tend to incriminate him. The discussion hereinabove, regarding commingling of money in the Rite transaction, is applicable here. The evidence supports the finding that appellants commingled the Gately money in violation of said section 10176(e).

Appellants assert that the evidence does not support the finding that they wilfully neglected to give the Gatelys a copy of the commissioner's public report. Mrs. Gately testified that she never saw that report. Pond testified that

he gave the Gatelys a copy of the report, and that one of the reports is nailed to the wall, beside the Ranchos map, in his front office. Appellants argue that, although the evidence as to whether they gave the report to the Gatelys was conflicting, the evidence does not prove that the failure to give the report was wilful. Section 2795 of the Administrative Code provides that the owner, subdivider, or agent shall not accept a deposit on any lot in a subdivision until a true copy of the commissioner's public report on the subdivision has been given to the prospective purchaser and his receipt taken therefor. The evidence supports said finding.

Another charge (No. 4), which the commissioner found to be true, was that about November 19, 1950, the licensees fraudulently induced Mrs. Barrett to buy a lot in Golden West Ranchos, and fraudulently represented that prior to January 1, 1951, they would place a well and pump on the lot, and would build thereon a chicken house; that relying on these promises Mrs. Barrett paid $3,000 to licensees as a deposit; that no part of said agreement has been performed; that the actions of the licensees were in violation of sections 10176(a),[4] 10176(b), and 10176(i) of the Business and Professions Code.

Another charge (No. 8), which the commissoner found to be true, was that on November 19, 1950, the licensees accepted a deposit from Mrs. Barrett to be applied upon the purchase of said lot, and that prior to the acceptance of the deposit they did not give her a copy of the commissioner's public report; that the said acts of the licensees were in violation of section 2795 of the Administrative Code.

█ Appellants contend, with reference to the Barrett transaction, that the evidence does not support the finding that said representations of appellants, regarding proposed improvements, were made with no intention of performing but only for the purpose of inducing Mrs. Barrett (Marsiglia) to enter into said agreement and to pay $3,000 as a down payment. They argue that the fact that the improvements were not made does not justify a conclusion that he did not intend to make the improvements; and that the time for making the improvements was extended. On November 19, 1950, Mrs. Barrett paid $3,000 to Pond as a deposit on the purchase price of a lot in Golden West Ranchos. The deposit was paid as follows: $1,000 cash, a check for $1,500, and a check for

---

[4]Section 10176 provides: "The commissioner may . . . revoke a real estate license . . . where the licensee . . . has been guilty of . . . (a) Making any substantial misrepresentation."

$500. The purchase price was $12,750. The deposit agreement was signed "Stillman Pond Real Estate Broker, License No.—— By Stillman Pond, Salesman." That agreement provided that the seller would put a well on the lot and build "a 4000 sq ft chicken house," and would move a log cabin onto the lot. Mrs. Barrett testified that Pond told her that everything would be completed by January 1, 1951; that she asked Pond on several occasions to put the transaction through escrow, but an escrow was not opened; that she spoke to Pond approximately six times about digging the well and building the chicken house; that, upon his request, she extended the time for completing the chicken house to January 30th. The log cabin was placed on the lot. The construction of the chicken house was started in the latter part of January, 1951 (the record does not show to what extent it was started). No other improvement was commenced. She made three or four demands upon Pond for the return of her money, but no part of it was returned. Mrs. Barrett also testified that about January 10, 1951, when she was in Pond's office, he told her he had something he wanted her to sign, and then he went to his automobile, brought his brief case in, put a paper in front of her, placed his hand in the middle of the paper, and told her to sign the document—that it was exactly like the other copy, that he was in a hurry; that she signed the document, but did not read it. It was not a copy of the original document (deposit agreement), which she had signed on November 19, 1950, but was an "Agreement for Sale of Real Estate." Pond testified that at the time he asked her to sign the second document he told her he had her contract of sale completed and that it was the same amount as the amount in the deposit receipt. The finding to the effect that Pond did not intend to perform his agreement regarding improvements is supported by the evidence.

Appellants assert that the evidence does not support the finding that they wilfully neglected to give Mrs. Barrett a copy of the commissioner's public report. Mrs. Barrett testified that she did not see that report. The discussion hereinabove, regarding the public report in the Gately transaction, is applicable here. The evidence supports said finding.

Another charge (paragraph V of supplemental accusation), which the commissioner found to be true, was that about February 11, 1951, the licensees entered into negotiations to sell to Mr. and Mrs. Grider a lot in Golden West Ranchos

for $12,750; that in the negotiations licensees represented that the soil on the lot was sufficient to grow anything except citrus fruits, that the soil was excellent for growing alfalfa, the soil was not alkaline, a plentiful supply of water at a depth of 100 feet was guaranteed for a year; that in reliance thereon the Griders agreed to buy said lot, and they paid to licensees $500 as a deposit; that said representations were false and the licensees knew they were false when they made them; that said acts of the licensees were in violation of sections 10176(a), 10176(b), 10176(i) and 10177(f)[5] of the Business and Professions Code.

Another charge (paragraph VI of supplemental accusation), which the commissioner found to be true, was that prior to the acceptance of the deposit referred to in said paragraph V the licensees did not give to the purchasers a copy of the commissioner's public report.

■ Appellants contend, with reference to the Grider transaction, that the evidence does not support the findings to the effect that appellants falsely represented to the Griders that the soil was sufficient to grow anything except citrus fruits, it was excellent for alfalfa, the soil was not alkaline and there was ample water; that appellants dishonestly neglected to show the commissioner's report to the Griders. They argue that Pond was acting as owner of the property in making the sale, and he was allowed to do what is known as seller's puffing; that the evidence tended to prove that he believed his statements to be true; that the Griders did not rely upon his representations because they were familiar with alkaline soil, they asked him about the nature of a visible deposit of alkali on the land, and they immediately checked for information concerning the soil. Mrs. Grider testified that Mr. Grider asked Pond whether the soil would grow alfalfa, and Pond replied that it would grow anything except citrus fruits; that there were spots on the land where evaporation left a white residue, and she asked Pond if there was alkali in the soil; that he replied "No," and that leveling the land would take care of the spots. The testimony of Mr. Grider, with reference to Pond's representations as to the soil, was in substance the same as the testimony of Mrs. Grider. Pond testified that he told the Griders that the soil all the way from

[5]Section 10177 provides: "The commissioner may . . . revoke the license of any real estate licensee, who . . . has . . . (f) Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license."

Lancaster has an alkali condition; that he did not tell them there was no alkali on that land, and he did not tell them the soil would grow alfalfa and anything except citrus fruits; that anyone who would put in 2 acres of alfalfa should have his head examined; that he said the soil would grow permanent pasture, garden, lawn, trees and flowers. Whether or not Pond made the alleged representations was for the determination of the commissioner. Th evidence supports said finding. The evidence also supports the finding that appellants wilfully neglected to give the Griders a copy of the commissioner's report.

Another charge (No. 5), which the commissioner found to be true, was that about December 27, 1950, a judgment was entered by the superior court in a matter entitled "*Waldo Willhoft* vs. *Stillman Pond and Vivian L. Pond*"; the judgment was based upon a complaint wherein it was alleged that appellant Pond had fraudulently induced the plaintiff to execute a note as accommodation maker and as a result of a default on the part of Stillman Pond, the plaintiff was forced to and did pay to the payee $3,769.29; that the said acts of Pond were in violation of section 10177(f) of the Business and Professions Code.

The said allegations of the complaint regarding fraud, referred to in said charge, were in the second cause of action of the complaint. The first cause of action in said complaint did not allege fraud, but was to the effect that plaintiff as an accommodation maker paid the balance due on said note, namely, $3,769.29. Pond testified in the hearing before the commissioner to the effect that he did not contest the taking of judgment against him because plaintiff Willhoft agreed that a judgment based upon fraud would not be entered against him. There were no findings in that action. There was a recital in the judgment that all the allegations in both causes of action are true. Mr. Willhoft did not testify in the hearing before the commissioner and there was no evidence, other than the testimony of Pond, regarding the transaction upon which the judgment was based. Pond testified that he owned an orchestra that was in New York; that he told Mr. Willhoft that he needed $10,700 to finance it; that he used the money for the purpose for which he borrowed it. In *Manning* v. *Watson*, 108 Cal.App.2d 705 [239 P.2d 688], which was a proceeding in mandate to compel the Real Estate Commissioner to annul his order suspending a real estate broker's license, a certified copy of a judgment of conviction

of a misdemeanor was received in evidence by the commissioner. The court held therein that the copy of the judgment was admissible only for the purpose of supplementing or explaining some direct evidence as to the factual basis for the judgment. The evidence herein as to said charge No. 5 was not legally sufficient to support an order revoking the licenses.

Appellants also contend that the evidence does not support the finding of the court that the corporation, Stillman Pond, Inc., was merely the *alter ego* of Heber Stillman Pond. Pond testified that the corporation, Stillman Pond, Inc., was incorporated in 1945 or 1946, he is president of the corporation; his wife is vice-president; another person is either secretary or treasurer, but he does not remember his name; no stock was issued; no directors' meeting has been held since the corporation was organized. The deposit agreements in the Barrett and Grider transactions were signed by Pond as follows: "Stillman Pond Real Estate Broker, License No.—— By Stillman Pond, Salesman." It could be inferred from such signatures that Stillman Pond, an individual, was acting as salesman for Stillman Pond, Inc., the corporation. If he were not so acting, then it would seem that he was purporting to act as salesman for himself. The evidence supports the finding that the corporation was the *alter ego* of Pond.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied February 10, 1953, and appellants' petition for a hearing by the Supreme Court was denied March 19, 1953.