[Civ. No. 19711. Second Dist., Div. One. Feb. 25, 1954.]

ROSCOE J. WILSON, Appellant, v. GEORGE STEARNS
et al., Respondents.

Simpson & Wise, Raymond C. Simpson and George E. Wise, for Appellant.

Feeley & Saevig, Donald E. Feeley and Roger A. Saevig for Respondents.

WHITE, P. J.—This is an appeal by plaintiff, a licensed real estate broker, from an adverse judgment in an action to recover commissions from defendants.

The record reveals that defendant George Stearns was a subdivider of tract properties. On January 13, 1947, plaintiff prepared and submitted to defendant Stearns a written contract, the pertinent portions of which read as follows:

"For and in consideration of services to be performed by Roscoe J. Wilson, hereinafter called Agent, I (we) hereby employ said Agent as my (our) sole and exclusive agent to sell or exchange for me (us) that said real property situated in the County of Orange, State of California, to wit:

"N½ of N.E.¼ of Sec. 29, Twsp. 4 S. and R. 11 West of S.B.B. & M. and for buildings to be constructed thereon, and I (we) hereby grant said agent the exclusive right to sell or exchange the same at a price (or prices) and terms to be later determined. This employment and authority shall continue irrevocably until completion of subdivision project now contemplated; but in the event the subdivision promotion is discarded and the seller decides to sell or exchange the raw or unimproved land, then this exclusive employment and authority shall be for a ninety (90) day period only, the specific dates of which shall be conveyed in a letter of notice to the agent and acknowledged by him.

"As and for the compensation of said Agent hereunder, I (we) agree to pay said Agent five (5%) percent of the selling price in the event that sale or exchange of property is made as sale or exchange of raw or unimproved land or acres, regardless of size of plot or parcel, but in the event sale is made after completion of home or homes on the land, I (we) agree to pay two and one-half (2½%) percent of the selling price of each such home so sold.

"In case a deposit is forfeited, one-half of same shall be retained by or paid to said Agent, and one-half to me (us), provided, however, that Agent's portion of such forfeiture shall in no case exceed the amount of the specified commission.

"I hereby acknowledge receipt of a copy of this listing.

"OWNER (SGD) GEORGE STEARNS.

"In consideration of the above employment, the undersigned Agent agrees that in the event the sales campaign fails to keep pace with the process of construction that the principals hereto shall, in conference, decide upon a method or

methods to be employed in correcting such unfavorable situation.

"AGENT (SGD) ROSCOE J. WILSON"

At the time the contract in question was entered into, defendant George Stearns held title to the property therein mentioned. Said property was located near the Los Alamitos Naval Air Station in Orange County, and was called Alamo Ranchos.

On April 9, 1947, the Alamo Development Company, a California corporation, was organized to engage in the general contracting and construction business in this state, including the development of the tract property referred to in the aforesaid contract.

About May 5, 1947, 90 shares of stock in Alamo Development Company were issued to defendant George Stearns, and Etta Mae Stearns, his wife, as consideration for certain real property located in San Pedro, California, which land was then subdivided by the corporation.

On June 14, 1947, Alamo Development Company sold to defendant George Stearns and his wife, 306 shares of its capital stock for $30,000 cash, and an additional 94 shares in return for the land at Alamo Ranchos, which is described in the contract here at issue. Thereafter, Alamo Development Company subdivided the Alamo Ranchos property.

While all shares of the corporation's stock were issued to defendant Stearns and his wife, the former testified he had an oral agreement with defendant Franklin Hall, a general contractor who supervised the construction of the tract homes thereafter erected, that one-half of the issued stock was held in trust for the benefit of defendant Hall.

Defendant George Stearns was president and treasurer of the aforesaid corporation, and his wife was vice-president and secretary.

When subdivision of the land involved was commenced, defendant George Stearns built a building on the tract in which he maintained an office for himself, his secretary and attorney, and in which plaintiff Wilson and his sales staff were provided with office space as the sales office for the tract. After the preliminary work of making contracts and the necessary preparations for the sale of the subdivision houses, plaintiff Wilson and his employees started making sales of the tract houses in January, 1948. Wilson had three salesmen working under him, Whitlock, the sales manager, Mrs. Whitlock, his wife and a Nellie White. All of the sales

of houses in the tract were accomplished as a result of the efforts of plaintiff and his three employees.

All of the houses in the tract, 85 in number, were sold by plaintiff, the last sale being made in July, 1948. The total value of these sales made by plaintiff was $671,900.

It was stipulated at the trial that the reasonable value of plaintiff's services was that provided by the contract, to wit, $17,089.06, and that if defendants are liable for said sum, they are entitled to a credit of $5,278.34, representing a credit given by defendant Stearns to Mr. Whitlock, one of plaintiff's employees, toward the purchase by Whitlock of one of the tract houses, defendants treating said credit as an advance against commissions.

There was testimony that during the period he was engaged in selling the tract houses, plaintiff inquired of defendant Stearns about the commissions and was promised he would be paid later. That at no time did defendant Stearns say he would not pay the commissions. Plaintiff did not have any previous experience in tract selling. There was testimony that when plaintiff asked defendants Stearns and Hall about payment of commissions they would say, "They didn't have the money to pay the commissions." ". . . just as quickly as they could get some more money—get some of the creditors taken care of, then probably there was going to be some money for the sales commissions." It appears that no written contract, memorandum or agreement was made by Alamo Development Company, Inc., to pay commissions to plaintiff for the sales made by him.

Following a trial before the court sitting without a jury, findings of fact were made, and insofar as here material, include the following:

"That the allegations of paragraph IV are true, except that defendant, George Stearns, was the sole owner of said real property; that it is true that defendant, George Stearns, conveyed said real property to defendant, Alamo Development Company, a corporation, which was the *alter ego* of said defendant, George Stearns."

The court further found that while title to the houses sold was vested in Alamo Development Company, such corporation, ". . . was owned solely by defendant, GEORGE STEARNS, and which was the *alter ego* of said defendant, GEORGE STEARNS."

It was also found by the court as follows:

"The Court finds that the contract between plaintiff and

defendant, GEORGE STEARNS (Exhibit A) has been fully performed by Plaintiff; that the land described in the agreement was transferred on June 23, 1947, to defendant, ALAMO DEVELOPMENT COMPANY, a corporation; that said corporation was solely and wholly owned by defendant, GEORGE STEARNS, and was his alter ego; that records were kept by said Defendants of plaintiff's sales as a broker and the amount of commissions earned; that plaintiff has fully performed every service required by said contract on his part, and that defendants, GEORGE STEARNS and ALAMO DEVELOPMENT COMPANY, a corporation, have received full benefit therefrom, which benefit, amounting to sales of their properties in excess of $671,000.00, they have received and retained; that no part of said contract between plaintiff and said defendants is executory, insofar as plaintiff is concerned; that according to the terms of said contract, the commissions to be paid to plaintiff by said defendant, George Stearns, for said services is the sum of $17,089.06; that the sum of $5,278.34 has been paid to plaintiff on account thereof; that plaintiff has never made a practice of procuring exclusive brokerage contracts wherein there was no specified termination date."

Notwithstanding the foregoing findings of fact, the court, in its conclusions of law, held:

"That the contract alleged and introduced in evidence by Plaintiff contravenes Section 10176(f) of the Business and Professions Code of the State of California, and is therefore illegal and void ab initio, and no recovery can be permitted thereon."

Judgment was accordingly entered for defendants.

As his first ground for reversal appellant earnestly contends that in view of the findings of the court that he performed every service required of him by the contract in question; that defendant George Stearns and his *alter ego*, defendant Alamo Development Company, have received full benefit therefrom which they have retained, the conclusions arrived at by the court that appellant was not entitled to recover because of the provisions of section 10176, subdivision (f), of the Business and Professions Code was erroneous.

Insofar as here material, the code section in question provides:

"§ 10176. Investigation of actions of licensees: Grounds for suspension or revocation of licenses. The commissioner may, upon his own motion, and shall upon the verified complaint in writing of any person, investigate the actions of any person

engaged in the business or acting in the capacity of a real estate licensee within this State, and he may temporarily suspend or permanently revoke a real estate license at any time where the licensee within the immediately preceding three years, while a real estate licensee, in performing or attempting to perform any of the acts within the scope of this chapter has been guilty of any of the following: . . .

"(f) The practice of claiming, demanding, or receiving a fee, compensation or commission under any exclusive agreement authorizing or employing a licensee to sell, buy or exchange real estate for compensation or commission *where such agreement does not contain a definite, specified date of final and complete termination.*" (Emphasis added.)

Respondents' contention is that a contract made contrary to the terms of the law designed for the protection of the public and prescribing a penalty for the violation thereof, is illegal and void, and that no action may be brought to enforce such a contract. Undoubtedly, the general rule in this state is that when it appears there is a violation of such a statute, the prescribed penalty contained therein is the equivalent of an express prohibition and, that a contract made contrary to the terms thereof is void (*Berka* v. *Woodward,* 125 Cal. 119 [57 P. 777, 73·Am.St.Rep. 31, 45 L.R.A. 420]).

The rule is, however, not without exception. In *Harris* v. *Runnels,* 12 How. (U.S.) 79 [13 L.Ed. .901], the Supreme Court of the United States said, "before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, the statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so."

We are satisfied from an examination of the contract here in question, that it does not come within the legislative intent as expressed by the aforesaid statute.

Although believing he was precluded from rendering what he considered to be a proper judgment in the case at bar by the decision in *Dale* v. *Palmer,* 106 Cal.App.2d 663 [235 P.2d 650], the trial judge was in accord with our view of the legislative intent as evidenced by the language contained in his "Memorandum and Order for Judgment," as follows:

"In enacting this section (Bus. & Prof. Code, § 10176), I think the evil which the legislature had in mind was the practice of some brokers to obtain contracts which placed

themselves in a position to claim commissions for an indefinite time without performing any services, nor, perhaps ever intending to. It is difficult to see what evil there is in claiming or recovering commissions where, as in this case, valuable, timely and lawful services are rendered to the satisfaction of the seller, the seller claims no prejudice from the fact that the agency was exclusive or that the termination date was indefinite and there is no evidence that the broker ever before claimed a commission under or entered into such a contract.''

A mere reading of the statute at once suggests that it is aimed at fraudulent or dishonest conduct by real estate brokers who engage in, *"The practice* of claiming, demanding, or receiving a fee, compensation or commission under any exclusive agreement authorizing or employing a licensee to sell, buy or exchange real estate for compensation or commission where such agreement does not contain a definite, specified date of final and complete termination.'' (Emphasis added.)

According to 72 Corpus Juris Secundum, at page 470, ''Practice'' consists of the ''habitual doing of certain things, the doing of an act more than once.'' Black's Law Dictionary, 3d edition, defines ''Practice'' as ''Repeated or customary action; habitual performance; a succession of acts of similar kind; habit, custom, . . .''

As was said by the trial judge and borne out by the record, there is not a scintilla of evidence that appellant was engaged in the ''practice'' denounced by the statute. In truth and in fact, the evidence shows that this was the first tract sold by appellant and that he had no previous experience in tract selling. It cannot be assumed that in adopting the statute here in question the Legislature did not have in mind the general usage and commonly recognized meaning of the word ''practice.'' If the lawmaking body had in mind that *all* contracts made in violation of section 10176 should be void or voidable, it could have expressly so provided as was done with respect to subdivision sales in sections 11540 and 11538 of the Business and Professions Code. Section 11540 provides that any sale or sales of such lots made in contravention of that statute is voidable at the option of the buyer, while section 11538 provides that it is unlawful to sell subdivision lots until a final map thereof has been duly recorded (see, also, Bus. & Prof. Code, § 16600). In the case of *Lowe* v. *Loyd,* 93 Cal.App.2d 684 [209 P.2d 851] (hearing denied by the Supreme Court), the court, in discussing the code section and

the subdivision thereof now engaging our attention, used the following language (at p. 687) in expressing serious doubts that this section affected the validity of contracts made in violation thereof:

"Moreover, it is conceivable that the regulation of *'practices' by real estate brokers may be the subject of regulation without affecting the validity of contracts made by them,* and we are not here considering what may or may not be sufficient cause to revoke or suspend the broker's license." (Emphasis added.)

We are cognizant of the rule that the aid of our courts cannot be sought through judicial proceedings to establish rights arising from a contract which violates the public policy of this state. That such "rule is not generally applied to secure justice between parties who have made an alleged illegal contract, but from regard for a higher interest—that of the public, whose welfare demands that certain transactions be discouraged" (*Franklin* v. *Nat C. Goldstone Agency,* 33 Cal.2d 628, 632 [204 P.2d 37]). That statutes such as the one now before us were enacted "for the safety and protection of the public" (*Gatti* v. *Highland Park Builders, Inc.,* 27 Cal. 2d 687, 690 [166 P.2d 265]), against imposition or fraud through "practices" such as are denounced by subdivision (f), section 10176 of the Business and Professions Code, but in the case at bar there was no imposition, no fraud, and no "practices" within the contemplation of the section just cited. ▇ In determining whether a contract is invalid the courts should strive to deal with the transaction so as to give effect to the fundamental purpose of the Legislature and to a wise public policy. ▇ And, in determining whether a real estate broker may be deprived of the value of his services, already admittedly earned, his contract will not be declared invalid upon the basis of anything not embraced within the terms of the applicable statute.

Both the trial court and respondent lean heavily upon the case of *Dale* v. *Palmer, supra.* It is noteworthy that on petition for hearing of that case before the Supreme Court, three justices voted for a hearing. And the facts involved in the cited case are easily distinguished from those present in the instant case. The *Dale* v. *Palmer* case involved an executory problem in that it was an action for anticipatory breach and for unearned commissions. The action at hand involves an agreement that was executed. It is an action for commissions admittedly previously earned and paid over to respondent

Stearns. In the *Dale* v. *Palmer* case the broker sold only one house for which he received his commission. In his action at law he sought commissions for the sales of six other houses which he had not sold. By comparison, appellant here sold 85 houses, without receiving payment of his commissions, and in his action at law confined his claim to compensation for services performed. Furthermore, Dale had a dispute regarding prices with Palmer, the seller, who thereafter discharged him due to Palmer's dissatisfaction with the manner in which he had handled the only house he sold. On the other hand, appellant in the case at bar performed fully in every detail to the complete satisfaction of respondent Stearns. Still another significant distinguishing factor is that there is no showing that Dale ever conferred any benefit whatsoever upon Palmer, while in the case of appellant Wilson, the trial court made a specific finding that respondent Stearns and his *alter ego,* defendant Alamo Development Company, received and retained the full benefit from the $671,000 of sales appellant made. Thus, the distinguishing features of the two cases are brought into sharp focus by the results realized from the totality of the facts. In other words, no unjust enrichment would result for Palmer since Dale's services were executory. In contradistinction, unjust enrichment results for respondent Stearns if appellant Wilson is barred from recovering commissions on executed sales.

Because of the manifold distinguishable facts in the *Dale* v. *Palmer* case and the one at bar, we are persuaded that the holding in the former case should be confined to the exact factual situation there present, and not militate against appellant's recovery herein.

This court has, on previous occasions, enunciated the doctrine that law and good morals should be one and inseparable. Based on this philosophy it must be assumed that statutes such as the one now engaging our attention are enacted, as heretofore stated, for the protection and safety of the public. They are not adopted for the benefit of a greedy and avaricious participant in a venture or enterprise who seeks to keep for himself the fruits of the enterprise to the exclusion of a real estate broker who has fully performed all of his obligations under the agreement, and is entitled to share therein. Where, as here, the alleged illegal transaction has been terminated, public policy is not served or public policy protected by denying one party to the contract relief against

the other. ▮ Rather than permit the unjust enrichment of respondent George Stearns, we are disposed to apply the rule announced in the case of *Norwood* v. *Judd*, 93 Cal. App.2d 276, 288 [209 P.2d 24], wherein, as Mr. Presiding Justice Peters, speaking for the court, in a well reasoned and considered opinion, said: "The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound, public policy. But the courts should not be so enamored with the Latin phrase *'in pari delicto'* that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. *Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied."* (Emphasis added.) (See, also, *Denning* v. *Taber,* 70 Cal.App.2d 253 [160 P.2d 900] and *Brooks* v. *Martin,* 2 Wall. (69 U.S.) 70 [17 L.Ed. 732].)

Viewed in the light of the facts present in the instant case, we find nothing in the other cases cited by respondent which does violence to the aforesaid views herein expressed.

Respondents' contention that the court erred in denying their motion made at the commencement of the trial, to exclude all testimony regarding the contract in question, on the ground that the illegality thereof was apparent on its face, cannot be sustained. The contract, upon its face, did not disclose that appellant was engaged in the "practice" of "claiming, demanding, or receiving a fee, compensation or commission," in violation of subdivision (f), section 10176 of the Business and Professions Code. The complaint alleged that the contract was fully executed and that respondent George Stearns was unjustly enriched. The case of *In re Lee's Estate,* 200 Cal. 310 [253 P. 145], does not aid respondents. This case simply held that a collateral attack cannot be made upon a final judgment of divorce, that evidence introduced in such an attempt was inadmissible, and could not therefore, serve to support a finding in derogation of the previously en-

tered final judgment. We find no analogy between the facts of the cited case and those presented by the pleadings herein.

Finally, respondents contend that the finding of *alter ego* was erroneous because unsupported by pleadings or proof. We find no merit in this contention.

In his first cause of action appellant pleaded that "at all times herein mentioned," respondent George Stearns was the owner of the real property involved in this action. Execution of the written agreement between appellant and respondent George Stearns was pleaded. On information and belief it was alleged that prior to June 1, 1947, respondent George Stearns transferred an interest in the written agreement to the other respondents who accepted the benefits thereof, adopted and ratified its provisions, retaining the profits thereof. It was also alleged that appellant sold the property in his capacity as agent for respondent George Stearns and for the other respondents, and judgment was prayed for against all respondents.

Respondents George Stearns and Ella Mae Stearns, his wife, filed a separate answer "for themselves alone," by which they denied that George Stearns was the owner of the property in question; denied generally and specifically that respondent George Stearns transferred an interest in the aforesaid agreement to the other respondents prior to June 1, 1947, or that appellant was acting as agent for George Stearns and the other respondents.

Respondent Alamo Development Company, Inc., filed a separate answer and for itself alone, denied all of the allegations of appellant's first cause of action.

That respondents were neither prejudiced, surprised or unprepared to meet the issue of *alter ego* is evidenced by respondents' answer whereby they carefully sought to sever Alamo corporation from respondent George Stearns individually. That respondents anticipated and were prepared to meet the issue of *alter ego* is further evidenced by the fact that at the outset of the trial when appellant's counsel sought to introduce testimony of the formation of the corporation and who were its incorporators and officers, counsel for respondents interposed an objection, saying in support thereof, "It seems to me it is obviously leading up to a alter ego showing which has not been pleaded, . . .".

Defects in a complaint may be cured by allegations of the answer. By their answers respondents denied ownership of the property; its transfer from Stearns to the

corporation and the existence of an agency between them and appellant. And, even if the pleadings were to be considered deficient in this respect, it is clear that respondents have not been misled to their prejudice by any variance between pleadings and proof (*Marr* v. *Postal Union Life Ins. Co.*, 40 Cal.App.2d 673, 680 [105 P.2d 649]; *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 523 [203 P.2d 522]).

We are now confronted with the question raised by respondents as to whether the evidence submitted on the issue of Alamo Development Company, Inc., being the *alter ego* of respondent George Stearns was sufficient to justify and sustain the finding that the corporation was "owned solely by defendant George Stearns," and "was the *alter ego* of said defendant George Stearns." ■ Before the courts will disregard the corporate entity of a corporation and treat it as the *alter ego* of an individual, even though the latter may own all of the stock of the former, it must appear that there is such a unity of interest and ownership that the individuality of such corporation and the owner or owners of its stock has ceased; and it must further appear that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. ■ Bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence (*Marr* v. *Postal Union Life Ins. Co.*, *supra*, p. 681).

Bearing in mind these principles, we now proceed to an examination of the interlocking relationships between the corporation and respondent George Stearns whose status as individual entities is here questioned. All of the stock of Alamo Development Company, Inc., was issued in the name of respondent George Stearns, who testified at the taking of his deposition in November, 1951, that all the stock was in his name, "and it is still in my name." (At the trial Stearns testified that in 1950, which was subsequent to the transaction here involved, he "released the stock to respondent Franklin Hall.") In any event, by reason of the conflicting testimony given by the witness Stearns, the court was entitled to reject his testimony that he had a verbal understanding with respondent Hall, the construction supervisor, that one-half of the issued stock belonged to the latter.

It appears from the record that two permits to issue shares of stock had been issued by the Commissioner of Corporations, the first dated May 5, 1947, which authorized the corporation to issue 90 shares to George Stearns and his wife, Etta Mae

Stearns, and the other authorized the corporation to issue 306 shares to George Stearns and Etta Mae Stearns, or to either or both of them for cash and 94 shares to George Stearns and Etta Mae Stearns, or to either or both of them, for the transfer of the real property here involved. But it appears from the testimony of Stearns above quoted that the stock was all issued to him alone and that this was a one-man corporation owned by Stearns alone.

Further evidence showing respondent George Stearns' relationship to the Alamo Development Company, Inc., is the following: Stearns was the president and treasurer of the corporation and his wife was vice president and secretary; at the time Stearns signed the agreement with appellant he was the owner of the property described in the agreement and later subdivided, and title to the land was in his name; that the property was thereafter transferred to the corporation; Stearns built a building on the tract, where he maintained an office and provided appellant and his staff with office space as the sales office; he saw Mr. Whitlock, appellant's sales manager, and talked to him "every time he would come in"; Stearns and Mrs. Hall, his secretary, who may have been an assistant secretary, "something like that," were authorized to sign checks at the tract on behalf of the corporation; Mrs. Hall also took the sales forms up to the lender in Los Angeles and receipted for remittances to the corporation, although Stearns receipted for some of the moneys on behalf of the corporation. Stearns was at the tract office a part of the time but not at any stated times; on several occasions Stearns discussed appellant's commissions due under the agreement and nothing was ever said about the agreement having been broken or that plaintiff would have to get a new agreement from the corporation—Stearns merely postponed payment to a future date.

The foregoing recital of evidence convinces us that there were here present all the necessary elements to constitute an *alter ego* relationship between George Stearns and Alamo Development Company, the corporation, namely, (1) control of the corporation by Stearns; (2) that the corporation was but the mere conduit of the business of Stearns; (3) that recognition of the separate existence of the corporation would sanction a fraud and permit oppression and injustice. The trial court was the judge of the value and effect of evidence challenging the verity of the testimony here narrated. The separate personality or capacity of a corporation being but

a statutory privilege, it must not be utilized for fraudulent purposes, such as a cloak or disguise for the evasion of contracts or other obligations. The evidence herein strongly points to the conclusion that the corporation was distinctly a one-man corporation. ▮▮ Where it appears that a corporation is being used merely as an instrumentality through which an individual who is the owner of its capital stock transacts his business, and where an inequitable result would ensue, the two should be considered as one (*Stillman Pond, Inc.* v. *Watson,* 115 Cal.App.2d 440, 451 [252 P.2d 717]; *Asamen* v. *Thompson,* 55 Cal.App.2d 661, 669 [131 P.2d 841]; *Grotheer* v. *Meyer Rosenberg,* 11 Cal.App.2d 268, 271 [53 P.2d 996]; *Loughran* v. *Reynolds,* 53 Cal.App.2d 250, 252 [127 P.2d 586]). "It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice." (*Gordon* v. *Aztec Brewing Co., supra,* p. 523.) The injustice here manifest is that to recognize respondent George Stearns and Alamo Development Company, Inc., as two separate and distinct entities would permit the former to avoid his liability on a contract through use of the corporate fiction for that purpose. This, neither law nor equity will sanction.

As to respondent Franklin Hall and Lois Hall, the court found that they "are not indebted to plaintiff; that plaintiff's dealings were entirely with defendants, George Stearns and Alamo Development Company, a corporation, said defendant's *alter ego*; that whatever arrangements defendant, Franklin Hall had with defendant, George Stearns, had nothing to do with plaintiff, such arrangement having been made between defendants, George Stearns and Franklin Hall to protect Franklin Hall from levy by creditors."

This finding is supported by competent and substantial evidence, and as to such last mentioned respondents, the judgment in their favor should be affirmed.

For the foregoing reasons the judgment is affirmed as to defendants Franklin Hall and Lois Hall. As to the remaining defendants, the judgment is reversed and the cause remanded with directions to the court below to enter judgment in favor of plaintiff and against said last mentioned defendants.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied March 15, 1954, and respondents' petition for a hearing by the Supreme Court was denied April 21, 1954.