[No. D047364. Fourth Dist., Div. One. Aug. 11, 2008.]

BRETT SCHAFFTER et al., Plaintiffs and Respondents, v.
CREATIVE CAPITAL LEASING GROUP, LLC, Defendant and Appellant.

■■■■■■■■■■■■■

■■■■■■■■■■■■■

## Counsel

David A. Kay; Smaha Law Group and Jason Barsi for Defendant and Appellant.

Law Offices of Mary A. Lehman, Mary A. Lehman; and J. Daniel Holsenback for Plaintiffs and Respondents.

Neil D. Kalin for California Association of Realtors as Amicus Curiae on behalf of Plaintiffs and Respondents.

## Opinion

**McCONNELL, P. J.**—Defendant Creative Capital Leasing Group, LLC (CCLG), appeals a judgment in favor of plaintiffs Brett Schaffter and Austin McBride Corporation, doing business as Re/Max Real Estate Consultants (Re/Max), entered after a bench trial. CCLG contends the court erred by finding it defaulted under various agreements with third parties to purchase condominiums, thereby triggering its responsibility under a buyer broker compensation contract (Buyer Broker Contract) with Re/Max to pay it commissions. CCLG asserts that although it refused to close escrow on the units for a reason not allowed by the purchase agreements—because appreciation during the lengthy escrow periods would not make resales sufficiently profitable—there was no default because the developers pursued no damages against CCLG and opted to cancel the agreements.

CCLG also contends the Buyer Broker Contract with Re/Max, and an identical contract with Schaffter's assignor, broker Pickford Realty, Ltd., doing business as Prudential California Realty (Prudential), are void because they did not contain a date certain for their termination. Further, CCLG asserts Prudential's assignment of rights to commissions is void because it was made prematurely. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Jack Winick and his two sons owned CCLG, a real estate investment company. Winick is a real estate broker and CCLG's corporate counsel.

CCLG devised a strategy to purchase condominiums in downtown San Diego before they were constructed on speculation they would substantially appreciate during one- to two-year escrow periods for lucrative resales.

Schaffter is a real estate agent who specialized in the downtown market, and Winick hired him to find desirable properties for CCLG. In March 2001 CCLG entered into the California Association of Realtors' (CAR) standard form Buyer Broker Contract with Prudential, under whose broker's license Schaffter worked. Schaffter was to represent CCLG exclusively in its purchase of condominiums in the Park Place development in exchange for a 2.3 percent commission on each unit, with a reduction for the 1.5 percent commission Park Place paid referring brokers. Under the standard contract, commissions were earned when the buyer entered into a purchase agreement, and they were payable on the close of escrow or the buyer's default.

On April 11, 2002, CCLG contracted to purchase eight units at Park Place for prices ranging between the high $400,000's and the high $600,000's. Unbeknownst to Schaffter, Winick never intended to finalize the purchases if the market did not perform as he expected, or to pay commissions on units that did not close escrow.

In June 2001, before construction on Park Place was completed, Schaffter left Prudential and began working as an independent contractor for Re/Max, which was the broker for Park Place. In January 2002 CCLG entered into an exclusive Buyer Broker Contract with Re/Max for Schaffter's representation in its purchase of condominiums in the Renaissance and Pacific Terrace developments. The contract provided for a 2.3 percent commission.

In February 2002 CCLG contracted to purchase six units at Renaissance, at prices ranging from the high $500,000's to the low $700,000's. In September 2002 CCLG purchased two units at Pacific Terrace, at prices of $389,900 and $489,900. Again, Winick did not intend to perform or pay commissions on units that did not appreciate as expected.

In late December 2002 Schaffter learned from Pacific Terrace that Winick sought to cancel CCLG's purchases. Schaffter called a meeting with Winick, and he informed Schaffter he would not complete the Pacific Terrace purchases and might not complete the Renaissance purchases because of insufficient appreciation. Winick advised Schaffter he did not intend to pay any commissions on units that did not close escrow, and he would not have signed the Buyer Broker Contracts had he understood commissions would be due even if CCLG did not close escrow on units.

CCLG did not close escrows on the Renaissance and Pacific Terrace units, and although the developers deemed the company in default and subject to liquidated damages, they ultimately allowed it to cancel the purchases to avoid litigation. With the exception of $1,000 for Pacific Terrace, the developers returned CCLG's deposits. CCLG refused to pay any commissions under the Buyer Broker Contract between it and Re/Max.

CCLG also missed the closing date on the Park Place units and the developer sent it notices of default and the intent to retain liquidated damages. After much difficulty and several months of delay, CCLG finally closed escrows. Park Place paid Prudential the 1.5 percent commission, but Winick refused to pay it the 0.8 percent balance on the 2.3 percent commission.

As required by the Buyer Broker Contracts, Schaffter attempted to mediate his commission claims. Winick, however, refused to participate. He agreed to a mediation date, but canceled it with one day's notice. The parties unsuccessfully attempted to settle the matter without a mediator.

Schaffter, as Prudential's assignee, and Re/Max sued CCLG for breach of contract.[1] A bench trial was held in July 2005, and the court found in favor of Schaffter and Re/Max. It awarded Schaffter $38,400 for commissions on the Park Place units plus prejudgment interest.

As to the Renaissance and Pacific Terrace projects, the court found CCLG defaulted on the purchase agreements and owed Re/Max commissions of 2.3 percent. The court determined the sellers were ready, willing and able to sell, and CCLG unilaterally chose not to close the deals. The court explained "that the buyer negotiated favorable cancellations . . . does not change the fact that the acquisition was prevented by default of the buyer." It awarded Re/Max $20,235.40 in commissions on the Pacific Terrace units and $88,397.05 in commissions on the Renaissance units plus prejudgment interest. Judgment was entered on August 23, 2005.

The court later awarded contractual attorney fees of $36,822.18 to Schaffter and $42,318.45 to Re/Max.

---

[1] CCLG cross-complained against Schaffter and Re/Max for negligent and intentional interference with prospective economic advantage, but the court granted their motion for judgment on the pleadings.

## DISCUSSION

## I

### *CCLG's Defaults*

CCLG contends the court erred by finding any default on its part, as the cancellations of its purchase agreements for the Renaissance and Pacific Terrace condominiums were "voluntary and mutually beneficial" to CCLG and the developers. (Capitalization and boldface omitted.) CCLG asserts the "buyer and seller are not obligated . . . to complete a transaction which is not beneficial to them, for the sole purpose of making sure a broker gets a commission." CCLG also asserts that even when a buyer does default on a purchase, the buyer and seller may "unwind the transaction for their mutual benefit," thereby extinguishing the buyer's obligation to pay a commission under the standard form Buyer Broker Contract.

█ The interpretation of a contract term presents a question of law we review independently. (*Penn-America Ins. Co. v. Mike's Tailoring* (2005) 125 Cal.App.4th 884, 889 [22 Cal.Rptr.3d 918].) "We infer the parties' intent from the written provisions of the contract. [Citation.] The written provisions of a contract 'are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage . . . .' [Citation.] [¶] 'Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning.' [Citation.] 'An ambiguity arises only if ". . . there [is] more than one construction in issue which is semantically permissible . . . ." [Citation.]' " (*Ibid.*)

Again, the Buyer Broker Contract provides commissions are payable on the close of escrow or "the Buyer's default." "[D]efault" necessarily refers to a default under the buyer's purchase agreement with the seller. Paragraph 2.5.7 of the six purchase agreements between Renaissance and CCLG provided: "Buyer's Duty to Cooperate. Buyer understands and acknowledges that upon Seller's acceptance of this Agreement, Seller will incur carrying and other costs attributable to Seller's holding the Property off the market, which costs will increase if Buyer fails to perform all actions necessary to close escrow. Accordingly, Buyer agrees to cooperate with Seller and shall use best efforts and diligently take any action necessary to timely close escrow, including, without limitation, promptly cooperating in good faith with Buyer's lender, Escrow Holder and the Title Company, and promptly providing all information requested by Seller, Buyer's lender, Escrow Holder or the

Title Company. Buyer acknowledges that Buyer's failure to so cooperate *shall constitute a default* hereunder." (Italics added.)

Similarly, paragraph 3.D. of the two Pacific Terrace purchase agreements provided: "Buyer shall execute all documents . . . and deposit the same in escrow, together with all funds and any other information necessary to timely close the escrow as provided herein, or buyer *shall be in default* of this agreement." (Capitalization omitted, italics added.)

It is undisputed that CCLG entered into binding purchase agreements for Renaissance and Pacific Terrace condominiums, CCLG refused to close escrow on them solely because of insufficient appreciation, and the purchase agreements did not allow cancellation for that reason.

Undisputed evidence also shows that when CCLG refused to close escrows, Pacific Terrace notified CCLG it was in default and subject to liquidated damages of 3 percent of the purchase prices. Spencer Kemmeijer, Pacific Terrace's sales manager at the relevant time, testified that Winick made it known he was a lawyer and dealing with him was "difficult." Pacific Terrace retained $1,000 of CCLG's deposits as liquidated damages, but ultimately returned the remainder because of Winick's threat of litigation.

James Milford, Renaissance's sales manager at the relevant time, testified the developer preferred to close the sales to CCLG and considered the company in default and subject to liquidated damages, but it ultimately agreed to cancel the purchase agreements and return the deposit for any unit it could resell at an equal or higher price. Within a few months Renaissance resold the six units for approximately the same prices CCLG agreed to pay, and perhaps higher prices on some of the units. Milford explained Renaissance opted not "to spend the time and effort in court or in arbitration over purchase deposits."

■ We conclude that under the plain terms of the Renaissance and Pacific Terrace purchase agreements, CCLG defaulted and that triggered the payment of commissions under the Buyer Broker Contract.[2] CCLG cites no evidence the developers' ultimate cancellation of the purchases was beneficial to them, and rather the evidence shows they merely chose to avoid litigation. ■ In any event, a seller's postdefault conduct is, of course, immaterial to

---

[2] Expert opinion on contract interpretation is usually inadmissible. (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1180 [82 Cal.Rptr.2d 162].) The parties, however, submitted conflicting expert opinions on the meaning of "default" under the Broker Buyer Contracts. We do not rely on it.

determining whether the buyer defaulted. As CAR explains in its amicus curiae brief, the "default" provision of the Buyer Broker Contract recognizes that when a buyer defaults under a purchase agreement, it would not be fair to deny the broker the right to be paid for services rendered under the Buyer Broker Contract. Nonpayment would obviously be unfair to a performing broker regardless of whether a seller pursued damages from a defaulting buyer.[3]

Contrary to CCLG's view, the trial court did not rule "that a buyer and a seller must complete a transaction that neither side desires to consummate, so the broker could receive his commission." Rather, the court acknowledged CCLG's argument that "buyers cancel agreements all the time," and explained "there are consequences when people cancel contracts" without a valid reason. Here, the consequence is CCLG's payment of commissions.

## II

### Contract Expiration Dates

The two Buyer Broker Contracts state they were to expire on the date CCLG's purchase of the Park Place, Renaissance and Pacific Terrace units closed escrow. CCLG contends the contracts are void because they do not specify a date certain for their termination. CCLG cites Business and Professions Code[4] section 10176, subdivision (f) under which the Real Estate Commissioner may discipline a broker for claiming a commission under an exclusive agreement if it does not contain a "definite, specified date of final and complete termination." The statute "expresses a public policy against open-ended exclusive real estate listing contracts." (*Nystrom v. First Nat. Bank of Fresno* (1978) 81 Cal.App.3d 759, 765 [146 Cal.Rptr. 711].)

CCLG relies on *Dale v. Palmer* (1951) 106 Cal.App.2d 663 [235 P.2d 650], in which a listing agreement between a contractor and a broker for homes to be constructed provided it would "automatically start when construction begins and continue exclusively and irrevocably with said agent until thirty days after notice of completion has been filed." (*Id.* at p. 665.)

---

[3] We have granted CAR's application to file an amicus curiae brief. CAR points out that there are instances in which a buyer's refusal to close escrow does not trigger the commission provision of the Buyer Broker Contract. For instance, residential purchase agreements ordinarily contain inspection or other contingencies giving a buyer the right to cancel, in that case a commission would not be equitable or within the parties' expectations.

[4] Statutory references are to the Business and Professions Code except when otherwise specified.

The broker sold one home and received a commission, but the parties then had a dispute and the contractor hired another agent to sell the six remaining homes. The broker sued for anticipatory breach of contract and unearned commissions, and the court held the agreement was in violation of section 10176, subdivision (f) because the "final termination date can be computed only by reference to the happening of a future event." (*Dale v. Palmer, supra,* at p. 667.) The court also held the agreement was void *ab initio,* citing *Smith v. Bach* (1920) 183 Cal. 259, 262 [191 P. 14], for the " 'general rule . . . that where a statute prohibits or attaches a penalty to the doing of an act, the act is void.' " (*Dale v. Palmer, supra,* at p. 667.)

■ Courts, however, have uniformly rejected *Dale v. Palmer*'s harsh rule when, as here, the broker seeks *earned* commissions. "Contract interpretation presents a question of law which this court determines independently. [Citations.] [¶] A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 472–473 [47 Cal.Rptr.2d 12].) The Buyer Broker Contracts state, "Broker shall be entitled to the compensation provided for in paragraph 8A above: [¶] (1) If Buyer enters into an agreement to acquire Property described in paragraph 2, on those terms or any other terms acceptable to Buyer." The commissions were payable on the close of escrow or the buyer's default, but under the plain language of the Buyer Broker Contracts they were earned earlier when CCLG entered into the various purchase contracts with the developers.

In *Wilson v. Stearns* (1954) 123 Cal.App.2d 472 [267 P.2d 59], the court held the lack of a specific termination date in an exclusive listing agreement did not preclude the broker from recovering earned commissions on 85 homes he sold for a subdivider. The court distinguished *Dale v. Palmer* on the grounds that case "involved an executory problem in that it was an action for anticipatory breach and for unearned commissions" (*Wilson v. Stearns,* at p. 480), the parties there had a dispute regarding prices and the client discharged the broker, and there was no showing the broker conferred any benefit on the client and "no unjust enrichment would result." (*Id.* at p. 481.) In contrast, in *Wilson v. Stearns,* the broker had fully performed and the client would have been unjustly enriched if he avoided payment of commissions. (*Ibid.*)

■ The *Wilson v. Stearns* court relied on *Norwood v. Judd* (1949) 93 Cal.App.2d 276, 288 [209 P.2d 24], in which the court explained: " 'The rule

that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound, public policy. But the courts should not be so enamored with the Latin phrase *"in pari delicto"* that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. *Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.'* " (*Wilson v. Stearns, supra,* 123 Cal.App.2d at p. 482, original italics.)

In *Nichols v. Boswell-Alliance Const. Corp.* (1960) 181 Cal.App.2d 584 [5 Cal.Rptr. 546] (*Nichols*), the court criticized the broad language in *Dale v. Palmer* as holding "any agreement made in violation of a statute is void. No distinction is made as to the type of agreement, or whether at the time of breach the agreement was executed or executory." (*Nichols, supra,* at p. 587.) The *Nichols* court noted the Supreme Court tempered the rule of *Dale v. Palmer* in *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 151 [308 P.2d 713], which explains: " 'In some cases, . . . the statute making the conduct illegal, in providing for a fine or administrative discipline excludes by implication the additional penalty involved in holding the illegal contract unenforceable; or effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each such case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved. [Citation.]' " (*Nichols, supra,* at p. 587.)

In *Nichols*, the court rejected the notion that real estate listing agreements that violate section 10176 are automatically void. (*Nichols, supra,* 181 Cal.App.2d at p. 587.) The court held a listing agreement lacking a definite termination date was enforceable to the extent it was performed. (*Id.* at p. 589; accord, *Babcock v. Houston* (1973) 33 Cal.App.3d 858, 863 [109 Cal.Rptr. 454].)

CCLG concedes it did not raise section 10176, subdivision (f) at the trial court, but it asserts the requirement of a specific termination date is solely an issue of law we may nonetheless decide on appeal. CCLG, however, goes on

to assert the *Wilson v. Stearns* exception to the *Dale v. Palmer* rule is inapplicable for *factual* reasons. Without any citations to the appellate record, CCLG asserts "there was no evidence that services worth the commission amounts were ever performed," "the only services provided were getting CCLG on a list at the beginning of the transaction," "Schaffter refused to perform any services after the signing of the purchase papers," and "Schaffter cannot establish that CCLG was unjustly enriched by his work in 'referring' CCLG to buy the unbuilt units at Park Place, Renaissance, and Park Terrace." CCLG asserts Schaffter's services were not worth more than the 1.5 percent commissions ($89,000) he received from Park Place, and somehow that means *Dale v. Palmer* controls instead of the *Wilson v. Stearns* line of cases.

■ Indeed, the question of whether a contract is void for violating a statute depends on the particular facts (*Wilson v. Stearns, supra,* 123 Cal.App.2d at pp. 481–482; *Nichols, supra,* 181 Cal.App.2d at p. 587), and thus we deem the issue waived. It is not our province to search the record for evidence to support CCLG's position, and more importantly, consideration of it would be unfair to the opposing parties. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184–185, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].) Schaffter and Re/Max had no notice of the issue and thus had no reason to develop evidence on it. Section 10176, subdivision (f) provides no defense to CCLG's nonpayment of commissions set forth in the Buyer Broker Contracts.

III

*Prudential's Assignment*

■ A breach of contract cause of action is assignable (Civ. Code, §§ 953, 954), and numerous cases involve a broker's assignment of rights to earned commissions to another party. (See, e.g., *Crane v. McCormick* (1891) 92 Cal. 176, 179 [28 P. 222]; *Merriman v. Wickersham* (1904) 141 Cal. 567, 568 [75 P. 180]; *Richmond Realeteria, Inc. v. Canterbury Estates, Inc.* (1965) 234 Cal.App.2d 400, 401 [44 Cal.Rptr. 435]; *Dencker v. Bernstein* (1950) 99 Cal.App.2d 757 [222 P.2d 460]; *Ritchie v. Weston, Inc.* (2001) 143 Ohio App.3d 176, 180 [757 N.E.2d 835] [broker who is licensed when cause of action for recovery of commissions accrues may assign rights to third party].)

CCLG, however, contends Prudential's assignment of its rights to commissions on the Park Place condominiums is void because it was made prema-

turely, before close of escrow, and thus required CCLG to pay a nonbroker for regulated services in violation of section 10138.[5] CCLG submits that Prudential could not legally assign its interest to Schaffter until escrow closed, because until that time Prudential had a duty to CCLG to assist it and oversee Schaffter's conduct. CCLG asserts Prudential breached that duty as neither it nor Schaffter helped it close escrow on the units.

■ Section 10177, subdivision (h) requires real estate brokers to supervise the activities of salespersons. CCLG relies on the following passage from *Grand v. Griesinger* (1958) 160 Cal.App.2d 397, 406 [325 P.2d 475]: "It is evident that brokers and salesmen belong in distinctly different categories and that the broker, because of his superior knowledge, experience and proven stability is authorized to deal with the public, contract with its members and collect money from them; the salesman, on the other hand, is strictly the agent of the broker. He cannot contract in his own name [citations], nor accept compensation from any person other than the broker under whom he is licensed; it is a misdemeanor for anyone . . . to pay or deliver to anyone other than the broker compensation for services within the scope of the act. (§ 10138.) [¶] The entire statutory scheme requires the broker actively to conduct his brokerage business and to supervise the activities of his salesmen. It precludes a salesman from taking charge of or conducting a business such as a rental agency which requires a broker's license."

The assignment was effective May 9, 2003, and it states it was given because CCLG had entered into agreements to purchase Park Place units but was disputing its obligation to pay commissions owed Prudential, Schaffter wished to "pursue all legal remedies available" to collect commissions, and Prudential wished to assign its claims to him for that purpose. Prudential was uninterested in pursuing CCLG because of the possibility of a cross-complaint.[6]

---

[5] Section 10138 provides: "It is a misdemeanor, punishable by a fine of not exceeding one hundred dollars ($100) for each offense, for any person . . . to pay or deliver to anyone a compensation for performing any of the acts within the scope of this chapter, who is not known to be or who does not present evidence to such payor that he is a regularly licensed real estate broker at the time such compensation is earned."

[6] CAR explains in its amicus curiae brief: "Real estate brokers have countless reasons why they would not want to pursue an action [for commissions] themselves and would instead prefer to assign a claim to a third party. For example, a . . . broker may not want to get a reputation, deservedly or not, for suing past or current clients. Or, the broker may determine that the amount to be gained from a successful suit . . . does not warrant the time and effort to pursue. The broker may make a business judgment that likelihood of success is outweighed by the possibility of failure. Or the broker may not want to run the risk of a counterclaim, legitimate or not, being filed against it."

The court was initially concerned about the timing of the assignment, but determined it was legal because the public policy of having broker supervision was satisfied under the particular facts. The court explained the "testimony is that the role of the buyer's broker in predevelopment or preconstruction purchases of condominiums in downtown San Diego is really that of a find. All the buyer's broker does is bring down someone and say[], 'Register me.' And it looks like that's the end of their role. The commissions are really more like a referral fee." Further, the court found that when the assignment was made the relationship between Schaffter and CCLG had broken down and it sought no further involvement from him or Prudential, and Winick, as a broker and an attorney "seemed to be perfectly capable of handling himself and did not either ask for or need any assistance."

We agree with the court's assessment. The evidence shows Prudential assigned its rights to Schaffter based on a good faith belief CCLG would default on the purchase of the Park Place units and dishonor the Buyer Broker Contract's commission clause, and not to shirk its responsibilities as a broker.

Before Prudential made the assignment, CCLG had not closed escrow on the scheduled date and was in default. In violation of the purchase agreements, CCLG had advertised some of the units on the multiple listing service even though it did not own them. Park Place's sales director, Dennis Serraglio, testified about the difficulties in getting CCLG to eventually close on the units. He said he had closed between 15,000 and 20,000 condominium units and no buyer was more difficult than Winick for CCLG. Serraglio believed Winick was merely "stalling" and had no valid excuse for not closing escrows sooner.[7] Moreover, before Prudential made the assignment, it knew CCLG defaulted on its purchase of the Renaissance and Pacific Terrace units solely because of insufficient appreciation and refused to pay commissions to Re/Max.

---

[7] In early April 2003 Park Place notified CCLG that escrow on six of the units (Nos. 504, 703, 1004, 1201, 1203 and 1204) was scheduled to close May 2, one week before the assignment date. CCLG missed the closing date and Park Place sent notices of default and demanded that CCLG instruct the escrow company to disburse CCLG's deposits as liquidated damages. Winick denied CCLG was in default since "walk-throughs have not been completed or even started." Winick, however, had canceled walk-through appointments multiple times. On July 10, Park Place notified CCLG it remained in default on the six units, but Park Place was willing to overlook the matter if CCLG closed on at least four of the units by July 11. CCLG closed on one unit on July 10, and on the other five units between July 14 and August 6.

Escrow closing on the remaining two units (Nos. TH-7 and TH-16) was scheduled for June 27, 2003. Escrow on unit No. TH-16 did not close until late September. In mid-November Winick requested the cancellation of the purchase agreement for unit No. TH-7. Park Place intended to allow the cancellation because it was "just tired of battling with Jack Winick." Winick, however, changed his mind and Park Place gave CCLG the opportunity to proceed with the purchase if it closed escrow by December 12. The purchase closed on December 16.

Additionally, Serraglio characterized the services of a buyer's broker in the purchase of unbuilt condominiums as "minimal." He explained "the broker must introduce the buyer to the sales office, and our salespeople take it from there so it's basically introduction." Schaffter, for Prudential, signed a Park Place form entitled "Broker Cooperation Program Client Registration Form" (some capitalization omitted) that allowed him to offer condominiums for sale to CCLG on Park Place's terms, and stated, "Prospective buyers must be introduced to the on-site sales personnel and registered at the time by the Referring Broker on the first visit to the development, in person." (Underscoring omitted.) The document also stated a 1.5 percent "*referral fee* will be paid from Seller's escrow proceeds at close of escrow." (Italics added.) Thus, when Prudential made the assignment its role was essentially fulfilled; Schaffter's relationship with Winick had soured and there were no outstanding duties to CCLG. Winick was a sophisticated buyer and he did not rely on Schaffter or Prudential in closing the Park Place escrows, and instead personally determined CCLG's course of conduct based on his assessment of the market.

Further, under the Buyer Broker Contracts Prudential earned the commissions when CCLG entered into purchase agreements for the Park Place, Renaissance and Pacific Terrace units. The contracts state, "Broker shall be entitled to the compensation provided for in paragraph 8A above: [¶] (1) If Buyer enters into an agreement to acquire Property described in paragraph 2, on those terms or any other terms acceptable to Buyer." Thus, Prudential assigned its rights to *earned* commissions to Schaffter, and not to unearned commissions. Given all the circumstances, the assignment does not violate the public policy reasons behind section 10138, and thus it is not void.

## IV

### Attorney Fees on Appeal

■ Schaffter seeks attorney fees on appeal. " '[I]t is established that fees, if recoverable at all—pursuant either to statute or [the] parties' agreement—are available for services at trial *and on appeal.*' " (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927 [275 Cal.Rptr. 187, 800 P.2d 543]; see *Serrano v. Unruh* (1982) 32 Cal.3d 621, 637 [186 Cal.Rptr. 754, 652 P.2d 985].) Schaffter is the prevailing party on appeal, and thus he is entitled to fees under his contracts with CCGL. "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees . . . ." (*Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498 [191 Cal.Rptr. 134].)

## DISPOSITION

The judgment and order are affirmed. The matter is remanded to the trial court for its determination of an award to Schaffter of attorney fees on appeal.[8] Schaffter and Re/Max are also entitled to costs on appeal.

O'Rourke, J., and Aaron, J., concurred.

---

[8] CCLG raises no issues pertaining to the attorney fees awards.