Filed 11/18/13  Pavone v. Yeager CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BENJAMIN PAVONE,<br><br>        Plaintiff, Cross-defendant and Respondent,<br><br>        v.<br><br>CHARLES E. YEAGER,<br><br>        Defendant, Cross-complainant and Appellant. | D059578<br><br><br>(Super. Ct. No. 37-2009-00081568-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey B. Barton, Judge.  Affirmed.

Boudreau Williams and Jon R. Williams for Defendant, Cross-complainant and Appellant.

Mayer Mangan and Katherine M. Mangan for Plaintiff, Cross-defendant and Respondent.

This dispute is between retired General Charles E. Yeager and one of his former attorneys, Benjamin Pavone. Pavone sued Yeager for attorney fees due under an attorney-client agreement and Yeager cross-complained against Pavone for damages caused by his unauthorized use of Yeager's name on his business Web site.

Yeager appeals a judgment denying him any relief and awarding Pavone $19,854 in fees. Yeager challenges the sufficiency of the evidence to support the jury's finding that Pavone did not knowingly use Yeager's name for purposes of advertising or selling legal services. He also contends reversal is required because the attorney-client agreement is ambiguous as to the scope of Pavone's services, the special verdict form did not require the jury to specify which services the agreement covered, and the special verdict form also contained unconscionable terms that render it invalid. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2008 Yeager, through his wife Victoria Yeager (Victoria), contacted Pavone about representing Yeager in various matters, including litigation commenced by Citibank over a credit card dispute and two pending federal actions, *Yeager v. Yeager* (E.D. Cal., No. 2:06-cv-001196-JAM-EFB) (*Yeager* matter), a financial dispute involving his children from his first marriage and *Yeager v. Bowlin* (E.D. Cal., No. CIV. 2:08-00102 WBS JFM) (*Bowlin* matter), a dispute over the unauthorized use of Yeager's name. Victoria expressed dissatisfaction with Yeager's current attorneys and indicated she wanted one attorney to represent Yeager in all his legal matters.

2

Pavone and Victoria negotiated an attorney-client agreement and in August 2008 Yeager executed it. The agreement defined the scope of work as "litigation of various claims and defenses." It specified an hourly rate of $275, required a $5,000 retainer, included an attorney fees clause, and stated, "[Victoria] will have the right to make litigation decisions on behalf of [Yeager]."

In September 2008 Yeager substituted Pavone in as his attorney of record in the *Yeager* matter and the *Bowlin* matter. His representation of Yeager, however, was short-lived.

On October 2, 2008, Pavone placed the following announcement on his business Web site under the "Latest News" category: "October 2, 2008 - The Law Offices of Benjamin Pavone is pleased to announce that Gen. Charles E. 'Chuck' Yeager has retained the firm for all of its litigation needs. General Yeager is the legendary flying ace, with aviation accomplishments ranging from an extraordinary combat record, to breaking both Mach 1 and Mach 2 speed of sound barriers, to being saluted in the movie 'The Right Stuff.' Ben: 'It is a privilege to continue to attract clients with such exceptional accomplishments and it is my hope to extend General Yeager's legacy of honor, dedication and achievement in the courtroom.' " (Boldface omitted.) The top of the Web site's home page stated, "General Chuck Yeager Comes On Board."

On October 9, 2008, Victoria sent Pavone the following e-mail: "Please remove Gen Yeager's name from your website. We are suing people for just such unauthorized use." In a responding e-mail Pavone took an unpleasant tone with Victoria, stating such things as, "Do you really want me to be your lawyer or are you just waiting for something

3

to be unhappy about?," and "Do you think Johnny Cochran had to get OJ's permission to put on his site, 'I won the trial of the century, got an acquittal for OJ Simpson'? The answer is no." Nonetheless, Pavone instructed his Web site designer to remove Yeager's name from the Web site. The announcement was removed on October 10, but unbeknownst to the Web site designer the "General Chuck Yeager Comes On Board" link "was still floating around out there" for some time.

Also in early October 2008, Pavone advised Victoria that in Yeager's federal actions he wanted to consult with "other lawyers that are at or above my experience level," at Yeager's expense. Pavone wrote, "Occasionally, when the issue is complicated enough, gray enough or foreign enough, I like to augment . . . decisions with the input of people I trust."

Victoria balked and accused Pavone of misrepresenting his skill level. Pavone responded with an e-mail that stated, "I am concerned that you've had a couple of bad experiences for one reason or another, and you're a tad defensive, quick to criticize, quick to judge. I don't fault you for that, but it is of a little concern to me. I want you to be aware of it." Victoria replied with an e-mail that stated Yeager would find a new attorney "if you aren't whom you appear to be."

In October 2008 Pavone moved to withdraw from the *Yeager* matter and the *Bowlin* matter. The following month his motions were granted.

Yeager refused to pay Pavone's legal bills for the various matters, which totaled $19,854. The parties' nonbinding mediation was unsuccessful. Pavone filed a first amended complaint against Yeager for breach of contract and related claims. Yeager

4

filed a first amended cross-complaint against Pavone for breach of contract, seeking return of the $5,000 deposit and invasion of privacy based on Pavone's unauthorized use of Yeager's "name and widely recognized heroic persona" on his business Web site.

After trial, the jury awarded Pavone $114,400 on his claim for breach of contract, and $19,854 on his claim for money due and owing. The jury found against Yeager on his cross-complaint. It determined Yeager did not perform his contractual obligations, and Pavone did not knowingly use Yeager's name to advertise or sell products or legal services.

The court conditionally granted Yeager's motion for a new trial, unless Pavone consented to a reduction of his award to a total of $19,854. During trial, the court excluded evidence of the time Pavone spent representing himself in this action, based on *Trope v. Katz* (1995) 11 Cal.4th 274, 277, 292 (attorney cannot recover fees for self-representation), but Pavone nonetheless made several references in front of the jury as to the number of hours he spent on this action. The court presumed the jury relied on his improper comments as there was no evidence to support an award above the fees of $19,854 he billed for his representation of Yeager. Pavone agreed to the remittitur.

Pavone then moved for $297,608.26 in fees billed by an attorney he retained to consult with him in this action. The court granted the motion in part, awarding him $55,000 as reasonable fees.

5

DISCUSSION

I

*Invasion of Privacy/Appropriation of Name*

The court instructed the jury as follows: "Yeager claims that [Pavone] violated his right to privacy. To establish this claim, [Yeager] must prove all of the following: [¶] (1) That [Pavone] *knowingly used* [*Yeager's*] *name to advertise or sell legal services*; [¶] (2) That the use did not occur in connection with a news, public affairs, or sports broadcast or account, or with a political campaign; [¶] (3) That [Pavone] did not have [Yeager's] consent; [¶] (4) That [Pavone's] use of [Yeager's] name was directly connected to [Pavone's] commercial purpose; [¶] (5) That [Yeager] was harmed; and [¶] (6) That [Pavone's] conduct was a substantial factor in causing [Yeager's] harm." (Italics added) (Civ. Code, § 3344; CACI No. 1803.)[1]

Yeager challenges the sufficiency of the evidence to support the jury's finding that Pavone did not "knowingly use Yeager's name on merchandise or to advertise or sell products or services." "Substantial evidence is evidence that a rational trier of fact could

---

[1] Civil Code section 3344, subdivision (a) provides: "Any person who knowingly uses another's name . . . , in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." Civil Code section 3344 is "a commercial appropriation statute which complements the common law tort of appropriation." (*KNB Enterprises v. Matthews* (2000) 78 Cal.App.4th 362, 366-367.) "What may have originated as a concern for the right to be left alone has become a tool to control the commercial use and, thus, protect the economic value of one's name, voice, signature, photograph, or likeness." (*Id.* at p. 366.)

6

find to be reasonable, credible and of solid value. We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence. We affirm the judgment if an examination of the entire record viewed in this light discloses substantial evidence to support the judgment." (*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 736.)

Yeager asserts Pavone's intentional and unauthorized publication of Yeager's name on his business Web site, standing alone, shows sufficient "marketing," as "neither the common law nor [Civil Code] section 3344 require additional promotional efforts . . . before liability is established." Yeager, however, does not suggest he challenged the above jury instruction, which required the jury to find Pavone "knowingly used [Yeager's] name *to advertise or sell legal services*." (Italics added.) The instruction given is a modification of CACI No. 1803, which requires a finding that the defendant "gained a commercial benefit [or some other advantage]" by using the plaintiff's name. " 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal. . . . This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.' " (*P & D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1344.) Thus, Yeager was required to show more than Pavone's intentional and unauthorized posting of his name.

Moreover, Yeager selectively cites Pavone's testimony, ignoring portions supportive of the jury's verdict. It is the appellant's duty to cite *all* significant facts in the

7

opening brief.  (Cal. Rules of Court, rule 8.204(a)(2)(C).)  " 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.* [Citation.]'  [Citation.]  Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived.' "  (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

Yeager asserts reversal is required because "Pavone believed that his representation of [Yeager] may be of interest to . . . colleagues, and may increase the stature of his law practice, and that's why he used [Yeager's] name on his website."  Pavone actually testified, "*The full statement is that the primary motivation for the statement on my website was because I was proud of the fact that I represented Yeager. It was also a matter of interest to my friends, colleagues, and family, and it also reflected an accomplishment that would potentially increase the statute [sic] of my law practice.*"  Yeager ignores the italicized testimony.

Yeager also fails to mention e-mails by Pavone indicating that when he posted Yeager's name on his Web site he was not attempting to generate business.  Pavone's Web site designer, Jeffrey Sihilling, testified he improvised a marketing plan "to create more traffic" to Pavone's Web site.  On September 21, 2008, Pavone wrote to Sihilling that the Yeager matters "will keep me busy until March or so of next year.  I will visit [the marketing plan] next year."  On October 2, the day of the posting, Pavone wrote to Sihilling, "Use that blurb for the news page, on the homepage add 'General Chuck Yeager

8

Comes On Board[.]'  Didn't forget about your webpage proposal, *but when this case came in, my immediate need to market stopped*."  (Italics added.)

Additionally, Yeager ignores the following testimony by Pavone:

"I really didn't think of [using Yeager's name] as a solicitation of clients.  I mean, I get clients from referrals.  That's my number one, by far and away, source of business.  And if I pay Martindale-Hubbell to market, I have a separate page on Martindale-Hubbell which links to lawyers.com.  That's really where the marketing is done."

"I don't use my website to increase business.  I think I've made myself clear about that.  My website is my online biography and, you know, people go to it for a variety of reasons.  I suppose one reason, it's helpful in business, but I don't use it as marketing.  It's a very low-volume site."

"I disagree with the characterization that I was trumpeting, but I mean, it was news for my law practice.  To that extent, yeah, I was proud to tell people that I was hopefully going to represent [Yeager] and represent him well."

"I didn't try to market the website at the time [when Yeager's name was posted].  I didn't need to.  So, therefore, a promotion didn't succeed or fail because I never was marketing it."

"No [I did not publish Yeager's name to increase business].  I thought it was nice, and I thought it was positive, and I was happy to represent him."

Yeager also ignores Sihilling's testimony there were only 48 hits to Pavone's Web site between October 2 and 10, 2008, during the time the Yeager announcement was posted.  Further, Yeager does not cite Pavone's e-mail to Victoria in response to her demand that he remove Yeager's name from the Web site.  It states, "If you read the site, you can obviously tell I wasn't using [Yeager's] name for some kind of commercial

9

exploitation any more than I report any good news about my practice, whether it be a win at trial, a complement [*sic*] from a client, or something else."

Moreover, Yeager does not acknowledge the precept that we resolve evidentiary conflicts and indulge all inferences in support of the judgment. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) If the evidence gives rise to conflicting inferences, one of which supports the jury's finding, we must affirm the judgment. (*Milton v. Perceptual Development Corp.* (1997) 53 Cal.App.4th 861, 867.) The testimony of a single witness may be sufficient, even when the witness is a party and other evidence contradicts the testimony. (*In re Marriage of Mix*, *supra*, at p. 614; *In re Robert V.* (1982) 132 Cal.App.3d 815, 821.)

We conclude Yeager's failure to fairly discuss the evidence constitutes forfeiture, and, in any event, our independent review of the record shows substantial evidence supports the jury's finding. Yeager essentially asks this court to reject Pavone's testimony and find more credible the opinion of Yeager's expert as to Pavone's supposed intent, but Pavone's credibility was a jury issue. We are not at liberty to reweigh the evidence or reappraise witness credibility. (*Tesoro Del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 634.)

II

*Attorney-Client Agreement*

A

Additionally, Yeager contends the client-attorney agreement was "hopelessly ambiguous" as to the scope of services and thus with the exception of the Citibank matter

10

Pavone should have been limited to quantum meruit recovery. (Capitalization & boldface omitted.) Yeager cites *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 26, which explains that "an attorney is entitled to recover the reasonable value of his services if there is no express employment contract providing for his compensation."

"Retainer agreements are enforced like any other contract if they are certain and unambiguous." (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 912.) " 'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] "The words of a contract are to be understood in their ordinary and popular sense." ' [Citations.] 'The language of [the] contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' " (*Id.* at p. 913.)

" 'An ambiguity arises when language may be applied in more than one way. To say that language is ambiguous is to say there is more than one semantically permissible candidate for application, though it cannot be determined from the language which is meant.' " (*County of San Joaquin v. Workers' Comp. Appeals Bd.* (2004) 117 Cal.App.4th 1180, 1185.) A "contract is not automatically construed against a drafter where, as here, the contract is the result of negotiations." (*Id.* at p. 1186; *Dunne & Gaston v. Keltner* (1975) 50 Cal.App.3d 560, 563, fn. 3 [attorney fees case].)

The attorney-client agreement states: "It is agreed that the Law Offices of [Pavone] . . . will represent [Yeager] . . . in litigation of various claims and defenses." The parties differed as to the scope of services. Pavone argued the agreement was

11

intended to cover all services he would render to Yeager, and Yeager argued it covered only the Citibank litigation.

The parties presented extrinsic evidence on the issue. While contract interpretation is subject to de novo review when there is no factual dispute, "[w]here extrinsic evidence has been properly admitted to aid in the interpretation of a contract, we uphold a reasonable construction of the agreement by the trier of fact which is supported by substantial evidence." (*Tesoro Del Valle Master Homeowners Assn. v. Griffin*, *supra*, 200 Cal.App.4th at p. 636.)

The jury determined there was a valid contract between Pavone and Yeager and it awarded Pavone the full amount he billed on all matters he worked on for Yeager, including the *Yeager* matter, the *Bowlin* matter, and the Citibank matter. Thus, we infer the jury found the contract covered all services.[2]

Yeager relies on the testimony of his expert, attorney Peter Thompson, that in his opinion the "agreement covers only the Citibank case." He based his opinion on an e-mail from Pavone to Victoria that was attached to the agreement and referred only to the Citibank litigation. The jury, however, could reasonably conclude the opinion conflicts

---

[2] Yeager complains that the special verdict form was insufficient because it did not require the jury to specify whether all of Yeager's legal matters were included in the attorney-client agreement. "If the verdict as rendered is *ambiguous* or incomplete, the party adversely affected may ask the trial judge to obtain a more certain verdict *before* the jury is discharged." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2012) ¶ 17:42, p. 17-15) "Failure to object to the form of the verdict before the jury is discharged *may forfeit* any ambiguity or insufficiency of the verdict." (*Id*. at ¶ 17:43, p. 17-15.) Yeager does not cite the record to show he asked for a more certain verdict.

12

with the agreement's scope of services as including "litigation of various claims and defenses," and that if the parties intended to limit services to the Citibank litigation the agreement could easily have said so.[3] Further, it appears the e-mail was attached to the agreement because it clarified how Victoria wanted Pavone to handle costs associated with the Citibank litigation and not because it limited his scope of services to that matter.

Yeager also relies on his testimony that the attorney-client agreement "doesn't give [Pavone] carte blanche to represent me in everything. You have to discuss it and cover various situations that you get involved in." Yeager testified, however, that he did not recall entering into an agreement with Pavone. He explained, "I am dependent upon Victoria to do all the legal work," including "negotiating with the lawyers." When shown the agreement, Yeager testified he signed it "after being briefed on it by Victoria, and she approved my signing it." He added, "I don't understand specifically what it says other than I can read it, but what it means, I don't know." In other words, his testimony was of no assistance to the jury.

Moreover, Yeager again fails to cite evidence supporting the verdict. In an e-mail to a third party, Victoria stated, "Do you know a great attorney to represent us in some matters[?]" She referred to "entities using [Yeager's] name without authorization for marketing," which would presumably include the *Bowlin* matter and that one case was

---

3    "Expert opinion on contract interpretation is usually inadmissible." (*Schaffter v. Creative Capital Leasing Group, LLC* (2008) 166 Cal.App.4th 745, 752, fn. 2.) There is an exception to this rule when the interpretation of technical words is at issue (Civ. Code, § 1645), but that is not situation here. The court allowed the testimony, however, and it appears Pavone did not object to it.

probably worth between $100,000 and $1 million, as well as "some piddily [*sic*] stuff" such as the Citibank matter and a dispute with AT&T.

Further, before the attorney-client agreement was signed, Victoria e-mailed Pavone on matters other than the Citibank litigation, including a potential $150,000 claim against "Montgomery" for the use of Yeager's "image for the opening credits of Star Trek The Next Generation," and a potential claim against "Cingular/AT&T." In one message, Victoria wrote, "I may have a couple more for you unfortunately."

Pavone signed the attorney-client agreement on August 20, 2008, and sent it to Victoria. During negotiations on the agreement between Pavone and Victoria, she continued to refer to matters other than the Citibank litigation, without indicating she intended that the agreement limit his services. In a September 3 message, Victoria responded to Pavone's request that she provide him with a signed agreement by stating she would get it to him "this afternoon." She also stated, "I may have a few more cases" and "I am attaching the *Yeager v. Yeager* one." She also discussed a potential claim for between $50,000 and $400,000 against a company selling military memorabilia for using Yeager's "trademark," and another one against a vitamin company for its breach of an agreement to give Yeager vitamins in exchange for his participation in commercials.[4]

Pavone testified he defined the scope of work as including "litigation of various claims and defenses" because "[w]hat I'm exactly going to do is not perfectly certain. I mean, it's clear enough that I'm suppose to work on Citibank. It's clear enough I'm going

---

[4]     Yeager's cross-complaint alleged he retained Pavone in the *Yeager* matter and the *Bowlin* matter "[i]n or about September 2009."

14

to work on Montgomery. But [Victoria's] got other claims of some unknown character, and she seems to have—she seems to want a lot of work, and she's not exactly sure what work she's going to want." He believed the language "was broad enough to handle pretty much anything I did." He explained that when he represents a party on only one matter, he puts the name of the matter in the agreement.

Further, Yeager substituted Pavone into both the *Yeager* matter and the *Bowlin* matter shortly after the agreement was executed, giving rise to a reasonable inference that Victoria always planned to include these matters in Pavone's scope of work. After Pavone requested that Yeager pay for consultants in the *Bowlin* matter, Victoria discussed that action in an e-mail and stated: "We hired you because you represented you could handle the case. To tell us after you have subbed in that you need expert advice is a bit misrepresentative. To then threaten us that you may make the wrong decision because we won't pay for your getting advice from the person you want to, is a bit . . . in bad faith. Especially as there is no time now for us to get a lawyer to sub in who is an expert in time. We had other options before we chose you. Had you told us you would need to bring in experts, we don't know if we would have hired you." (Capitalization omitted.) She accused Pavone of "attempt[ing] to change the agreement after the fact."

Additionally, Victoria's own testimony belies the argument she initially intended to hire Pavone only for the Citibank matter. She stated she hired him for Citibank "and a couple of cases, such as Montgomery and Company, Leiner Health Care."

We conclude Yeager forfeited the scope of services issue by not fairly discussing the evidence, and in any event, substantial evidence supports the verdict. Indeed, a

15

different finding would have been surprising. Further, as to his quantum meruit argument, Yeager concedes the reasonable value of Pavone's services was the same as the $19,845 he recovered for breach of contract.[5]

B

Yeager also contends the attorney-client agreement is unenforceable because it includes unconscionable terms. Yeager complains that paragraph 11 of the agreement purported to waive *Trope v. Katz, supra,* 11 Cal.4th 274, which precludes an attorney fees award for self-representation and purported to waive the requirement of a separate notice of the right to nonbinding fee arbitration after a dispute arose (Bus. & Prof. Code, § 6201, subd. (a)). Yeager asserts that taken together, these attempted waivers "paint a vivid picture of an attorney who has craftily drafted a fee agreement meant to make an end-run around various public policies and other provisions intended to protect clients from exactly that type of attorney over-reaching."

Yeager relies on Civil Code section 1670.5, subdivision (a), which provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

---

[5] Yeager's quantum meruit argument is an attempt to avoid the $55,000 in attorney fees awarded Pavone under the attorney-client agreement.

The "strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement." (*Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1477.) While Civil Code section 1670.5 " 'appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement[,] . . . it also appears to contemplate the latter course only when an agreement is "permeated" by unconscionability.' " (*Roman v. Superior Court*, *supra*, at pp. 1477-1478.) "If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 124; Civ. Code, § 1599 ["Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."].)

Even if portions of paragraph 11 were arguably unconscionable, an issue we are not required to reach, they are collateral and do not merit throwing out the entire agreement. They caused no harm as the court enforced *Trope v. Katz*, *supra*, 11 Cal.4th 274 and Pavone gave Yeager a separate notice of his right to nonbinding arbitration of the fee dispute.[6] Yeager's own expert opined that "the agreement is enforceable" notwithstanding a couple of objectionable provisions.

---

[6] Victoria denied receiving the notice, but a nonbinding arbitration was actually held.

17

DISPOSITION

The judgment is affirmed.  Pavone is entitled to costs on appeal.


                                                          McCONNELL, P. J.

WE CONCUR:


McDONALD, J.


O'ROURKE, J.