Filed 11/24/15  Aliev v. Courtney CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OKTAI ALIEV,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>DAN F. COURTNEY,<br><br>　　Defendant and Appellant. | D064239<br><br><br>(Super. Ct. No. 37-2011-00088393-<br>CU-FR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed.

Frederick C. Phillips for Defendant and Appellant.

Ronald W. Noya for Plaintiff and Respondent.

This appeal involves a disputed real estate commission arising out of the sale of commercial property.  After a bench trial, the superior court determined (1) the commission contract was unenforceable because neither the salesperson, Dan F. Courtney (Courtney), nor the "broker," Excalibur Commercial Real Estate Services (Excalibur), was a licensed real estate broker; and (2) Courtney breached his fiduciary duties by,

among other things, altering a deed of trust to insert his name as beneficiary, after the trust deed was signed by the trustor, Oktai Aliev, and notarized.

The superior court entered judgment (1) declaring the trust deed "null and void," (2) ordering Courtney to disgorge $60,000 in commission, and (3) awarding Aliev $97,125 in attorney fees.

On appeal, Courtney concedes the $60,000 commission Aliev paid was a "statutory violation" because neither he nor Excalibur was a licensed broker during the transaction. Nevertheless, Courtney contends the judgment should be reversed because: (1) the commission contract should be enforced to prevent Aliev from being unjustly enriched due to a "defect in the paperwork," (2) "no evidence was presented that Courtney altered the deed of trust," (3) Aliev's claim for restitution of the commission is time-barred, and (4) the attorney fee award should be reversed with the rest of the judgment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Purchase of the Engineer Road Property*

Courtney has been a licensed real estate salesperson since 1988, but does not hold a broker's license. In 1997 he began working for his father, Frank De Valera Courtney, a licensed real estate broker operating under the fictitious name, Excalibur Commercial Real Estate Services.

In 1999 Courtney represented Aliev, who sought to buy commercial property on Engineer Road in San Diego. Courtney's broker of record was his father, doing business as Excalibur.

2

Aliev's attorney, Richard Weintraub, formed an off-shore business entity, "II Limited," to take title to this property.  In June 2000 II Limited acquired the property.

Excalibur earned a $34,500 commission on the sale.  However, instead of being paid through escrow, Courtney asked Aliev to defer payment under a promissory note secured by a deed of trust.  At Courtney's request, Aliev executed a promissory note for $34,500 at 9 percent interest, secured by a trust deed on the Engineer Road property.[1]

B.  *Engineer Road Property Listed for Sale*

About two years later, in July 2002, Aliev decided to sell the same property.  He contacted Courtney to handle the transaction.

In the meantime, Courtney's father had died.  His broker's license expired and the Excalibur fictitious business name was "cancelled" with the Department of Real Estate effective May 16, 2001.

But Courtney continued doing business as "Excalibur."  He used a business card entitled, "Excalibur Commercial Real Estate Services, Dan F. Courtney, Principal."

In July 2002 Courtney prepared and presented to Aliev and Weintraub an "Exclusive Authorization and Right To Sell Agreement," which the parties refer to as the

---

[1]     There was conflicting testimony about the genesis of the note and trust deed. Aliev testified Courtney asked him to defer paying the commission and to sign the promissory note and trust deed for Courtney's own reasons.  Courtney testified it was Aliev's idea, in part because Aliev needed the cash, and also because Aliev wanted to conceal the transaction from his wife in pending divorce proceedings.  The text recites the facts in the light most favorable to the Respondent.  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)

3

"listing agreement." The listing agreement was entered into between Excalibur and II Limited. However, Excalibur was not a licensed broker.

Under the listing agreement, II Limited agreed to pay Excalibur a commission "in accordance with the Schedule of Commissions" attached. That schedule establishes a 6 percent commission for sales.

At trial, Courtney admitted he prepared the schedule of commissions by a "cut and paste" from other documents.. He copied a commission schedule used by another broker (Lambert Smith Hampton) and pasted a signature block at the bottom for II Limited and Excalibur. The signature block for II Limited says "Richard Weintraub," but it has Aliev's signature. Asked at trial, "How do we know you didn't get a signature somewhere and cut-and-paste it to the document?", Courtney responded, "I guess you don't. I don't know." Aliev admitted the signature on the commission schedule was his; however, he did not recall signing the document, adding, "the document itself looks funny to me."

C. *Courtney Contacts Edgerton To Be His Broker of Record*

Courtney knew the commission contract must be between a licensed broker and the principal in the transaction, and a salesperson may receive compensation only from the broker who holds his license. (Bus. & Prof. Code, § 10137.)

John Edgerton obtained his real estate broker's license in 1981. Edgerton retired from "active involvement" in the brokerage business in 1998. In the early 1990's Courtney had worked for Edgerton. By 2002, the time of this transaction, Edgerton had known Courtney "for a long time."

4

In July 2002 Courtney approached Edgerton and said, "Look, I've got a problem . . . my . . . broker that I'm employed by is no longer available. Would you do that for me on an interim . . . basis?" Edgerton was retired and reluctant to get involved. But as an "accommodation" to Courtney, he agreed to be Courtney's broker, providing that Courtney indemnified him for any loss. Edgerton did not want any money, stating, "I had no remuneration from this. Didn't want any. I didn't want to be involved in the business in any monetary way."

In late August 2002 Courtney prepared and faxed to Edgerton a Department of Real Estate "Salesperson Change Application." Courtney also faxed Edgerton a San Diego County "Fictitious Business Name Statement" with the name "Excalibur Commercial Real Estate Services." Courtney testified he intended Edgerton to "[s]ign that and get that handled" so Excalibur would be registered as a fictitious name under Edgerton's broker's license. Asked at trial, "Now, how was it that you expected Mr. Edgerton to figure out that what you wanted him to do was to prepare the County of San Diego form that is in four parts and record it," Courtney answered, "He's a smart enough guy to figure that out."

According to Department of Real Estate records, Courtney became "activated" under Edgerton's broker's license on August 25, 2002. However, Edgerton did not recall receiving the fictitious business name statement and, in any event, never completed it. "It never got done." Thus, as far as the Department of Real Estate was concerned, Excalibur was not identified with any licensed broker.

5

On September 4, 2002, Edgerton (as "Broker") and Courtney (as "Licensee") entered into a written agreement. Edgerton agreed to supervise Courtney "in accordance with the laws governing and regulating the conduct of compensated activities requiring a real estate broker's license . . . ." But Courtney "shall be entitled to keep all compensation earned . . . [h]owever, all agreements shall be in the name of Broker." Courtney agreed to indemnify Edgerton.

D. *Aliev Sells Engineer Road Property*

In early September 2002 Aliev was approached by the owner of neighboring property, Sunroad Auto Holding Corporation (Sunroad), who was interested in buying the Engineer Road property. Aliev said the property was listed for $2.2 million; Sunroad offered $2 million. Aliev "immediately" called Courtney, who arrived on site within 20 minutes. In Courtney's presence, Aliev continued to negotiate directly with Sunroad. Aliev said $2 million was not enough. Sunroad "offered not to hire a realtor on his side," which would reduce the 6 percent commission on a $2 million sale from $120,000 to $60,000. Aliev asked Courtney, "Are you okay with 3 percent?" Courtney said, "I didn't expect to receive more." Aliev testified, "[T]his was very simple and understood by all, 60,000."[2]

On September 13, 2002, Courtney prepared a "Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate" between Sunroad and II Limited. Courtney identified the "Seller's Broker" as "Excalibur Commercial." No buyer's broker

---

2    Courtney denied any such conversation occurred.

was identified. At trial, Courtney conceded Excalibur was never registered as a broker and John Edgerton should have been named as the broker for this transaction.

Edgerton testified he "review[ed] the documents"; however, he did not notice the broker was Excalibur. In fact, no document in this transaction has Edgerton's name on it—yet, as Courtney conceded at trial, "Edgerton was my broker at the time that the property was sold."

Jackie Wondrash of Chicago Title was chosen as the escrow officer. Wondrash had served as escrow officer for many other Excalibur transactions when Courtney was working for his father. She thought Excalibur/Courtney was the listing broker.

Wondrash sent documents to II Limited,[3] including a sales commission order for $120,000. Aliev's signature appears on this document, but he did not think he signed it. Aliev is a native Azerbajani with limited command of written English. He was examined at trial through a Russian interpreter. Whenever Courtney presented a document and told him to sign it, he would do so. He never refused to sign anything presented.

On November 19, 2002, escrow closed. Among other disbursements, escrow paid Courtney (1) $34,500 principal and $7,538.25 interest on the note he took for commission on the sale of the Engineer Road property in 2000, and (2) "Total commission" to Excalibur of $60,000. Escrow documents state "Commission reduction, Excalibur $60,000", which means "the broker reduced his commission at the time and had the proceeds, a portion of the proceeds, go to the seller."

---

3    II Limited quitclaimed its interest in the property to Aliev before the transaction closed.

7

According to Courtney, three days later, on November 22, 2002, he presented Aliev with a promissory note for $60,000 and a trust deed encumbering Aliev's home. But the promissory note is unsigned, and Aliev testified he never saw the note until this litigation.

The trust deed Courtney presented to Aliev did not have any person or entity named as "Beneficiary." Aliev did not understand that the trust deed would affect title to his home. Aliev signed the trust deed because, as he understood it, just as Courtney deferred receipt of the $34,500 commission in the 2000 purchase, Courtney was also wanting to defer payment of his $60,000 commission on the 2002 sale. When asked at trial to explain what a trust deed was, Aliev said, "Deed of Trust. Trust is Trust." He further explained:

> "Q: . . . Why did you sign this document [trust deed]?
>
> "A: Well, it's simple. When it was determined that Dan Courtney would be receiving 60,000, he once again asked me to retain that money in my account, and so he asked me to go to the notary to certify that this money is his that's going to stay in my account.
>
> "Q: And you agreed to do that?
>
> "A: Well, I had done it once before."[4]

---

4    Courtney's version of these events is significantly different—he testified Aliev wanted to defer paying the entire $120,000 commission to improve his cash flow, but Courtney would only agree to defer half. Courtney testified the trust deed was Chicago Title's idea after he explained the deferred payment plan to the escrow officer. The facts are recited in the light most favorable to Aliev, the plaintiff.

Courtney testified this was only the second time he had taken a promissory note (and deed of trust) for payment of a deferred commission (the first time being the deferred $34,500 commission on Aliev's purchase of the same property in 2000). However, Wondrash testified Courtney frequently used promissory notes for commissions, and in the past, she had prepared trust deeds for this purpose. In some of those other transactions, Wondrash had prepared the trust deed for Courtney; but in this case, she did not.[5]

After the trust deed was notarized, Courtney altered the document by adding (1) his name as "Beneficiary," (2) his name and address to the upper left corner ("Recording requested by and when recorded mail to"), and (3) the name "Oktai Aliev" in printing, under Aliev's cursive signature. The trust deed was recorded on May 8, 2003.

After escrow closed, Aliev saw the revised closing statement showing Courtney had received $60,000 commission due him. Aliev thought the trust deed would therefore be "destroyed."

E. *The Litigation*

On March 11, 2011, claiming Aliev owed an additional $60,000 (plus interest) in unpaid commission, Courtney recorded a "Notice of Default and Election to Sell Under

---

[5]     In closing argument, Aliev's attorney commented, "I have to admire the—kind of scheme on these deferred notes. You're entitled to a commission. The seller gets more money in closing. Prices are reduced. If there's any tax liability, the seller pays it because he's getting more money than he would otherwise. [¶] Courtney, he gets the notes. He gets notes saying they're loans, loans. Then when the loans are paid, there's no tax wrinkle because it's a loan and money is being repaid. There's no income. There's no 1099's. There's no trail. There's no nothing. [¶] You tell escrow, "Here's a loan. Pay this loan."

9

Deed of Trust."  On March 25, 2011, Aliev filed a complaint, and later, on April 4, 2011, a first amended complaint for:  (1) fraud; (2) breach of fiduciary duty, (3) cancellation of instruments, (4) quiet title, (5) declaratory relief, and (6) injunction.

The parties (Aliev and Courtney) waived jury.[6]  After a bench trial, the court issued a statement of decision.  The court found Aliev timely filed the action because "there is insufficient evidence the plaintiff received a copy of the recorded trust deed . . . prior to late 2010 or early 2011 to begin the running of the statute of limitations."  On the merits, the court determined, among other issues:

1.  "Courtney altered the notarized deed of trust in three ways:  He added his name as the beneficiary, added the printed name of the trustor Aliev under Aliev's notarized signature, and added his name and address in the 'when recorded mail to..' section of the document . . . ."

2.  The trust deed is "cancelled . . . ."

3.  The $34,500 commission on the purchase of the property was "earned and rightfully received."  The promissory note was signed when Excalibur was registered under Frank Courtney's broker's license.

4.  When the July 2002 listing agreement was entered into, Courtney was not working under the license of any broker, and it was unlawful for Excalibur to enter into the listing agreement because it was not registered with a licensed broker.

5.  "[A]ny oral instruction to escrow to pay Courtney directly without written authorization from his broker was a violation of law and Courtney's fiduciary duty to his client."

6.  "Courtney has no right to any commission except through his broker as a matter of California law and his deal with Edgerton, Excalibur is not a licensed entity and not authorized to receive payment from anybody . . . ."

---

[6]     Chicago Title did not appear; the register of actions shows Chicago Title filed a declaration of nonmonetary status (Civ. Code, § 2924*l*).  The register of actions also shows defendant Jeffrey Perwin was dismissed without prejudice on January 24, 2012.

7.  "Courtney's[] failure to disclose to escrow that Excalibur was not a licensed broker allowed an 'illegal' payment to be made to him as well as a breach of fiduciary duty to Aliev."

8.  "[T]here is no lawfully enforceable commission agreement by which Courtney is entitled to receive or keep the sale commission.  He was not a broker and did not receive a commission through a brokerage."

9.  "Courtney is presently attempting to collect a debt of $60,000 plus interest when no such debt exists.  Aliev owes Courtney nothing."

10.  "The fiduciary duties imposed upon Courtney required him to act honestly, with integrity and loyalty to Aliev.  [¶] Courtney breached these duties by engaging in the actions and causing damage."

11.  "Courtney personally received $60,000 for a real estate commission . . . .  Courtney was not entitled to receive this commission as he was not a real estate broker and did not obtain the funds through a real estate broker.  Further, he knew Excalibur was not registered with a real estate broker and therefore was not entitled to receive a real estate commission. . . .  He was not and is not entitled to his commission and is ordered to return to Aliev the $60,000 he received."

On January 17, 2013, the court entered judgment in favor of Aliev for $60,000.

The judgment also declared the trust deed "null and void," and ordered Courtney to "re-convey the trust deed to clear title to plaintiff's property."  On June 7, 2013, the court amended the judgment to add dollar amounts for attorneys' fees ($97,125) and costs ($4,856.30) to Aliev.  This appeal followed.[7]

---

7    Courtney filed his notice of appeal from the January 17, 2013 judgment, not the June 7, 2013 amended judgment.  However, the appeal from the original judgment includes the subsequent entry of dollar amounts for fees and costs.  (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222.)

11

DISCUSSION

I.  *STANDARD OF REVIEW*

We review the trial court's findings of fact in a statement of decision after a bench trial under the substantial evidence standard.  (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.)  The trial court's findings of fact will be upheld if there is substantial evidence to support them.  (*Ibid.*)  We view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.  (*Ibid.*)  Appellate review for sufficiency of the evidence extends to the entire record, and is not limited to facts mentioned in a trial court's statement of decision.  (*In re Shaputis* (2011) 53 Cal.4th 192, 214, fn. 11.)

II.  *RELEVANT PROVISIONS OF REAL ESTATE LAW*

California real estate law distinguishes between brokers and salespersons.  "'[T]he broker, because of his superior knowledge, experience and proven stability is authorized to deal with the public, contract with its members and collect money from them.'" (*Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1037.)  A salesperson is not authorized to act independently.  (*People v. Asuncion* (1984) 152 Cal.App.3d 422, 425-426.)  A licensed salesperson must be associated with one broker, who in turn holds the salesperson's license and is responsible for supervising his or her professional actions. (Bus. & Prof. Code, § 10137.)

Only a licensed real estate broker can collect a commission from the sale of real property.  (Bus. & Prof. Code, § 10137.)  A salesperson can contract only in the name of

12

his or her broker and can recover a commission only through that broker. (*Ibid.*;

*Edmonds v. Augustyn* (1987) 193 Cal.App.3d 1056, 1063, fn. 7.)

The purpose of the real estate licensing statutes is not to raise revenue, but "to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners." (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1455; *Williams v. Kinsey* (1946) 74 Cal.App.2d 583, 592.) Accordingly, any agreement to employ an unlicensed person to act as a real estate broker is illegal, void, and unenforceable. (*Fellom v. Adams* (1969) 274 Cal.App.2d 855, 862; *Estate of Prieto* (1966) 243 Cal.App.2d 79, 85.)

### III. *THE TRIAL COURT PROPERLY ORDERED DISGORGEMENT OF THE $60,000 COMMISSION PAID*

A. *Introduction*

Courtney contends the "undisputed facts of this case" compel reversal of the judgment for restitution of the $60,000 commission Aliev paid through escrow. Courtney asserts there is "absolutely no evidence" Edgerton failed to properly supervise him, and there was a mere "defect in the paperwork" resulting in Excalibur rather than Edgerton being identified as the broker. Courtney muses, "if [only] Edgerton had filed the Fictitious Business Name Statement," or had "scratched out the name Excalibur, and put in his own name" or if only Edgerton had "simply provided a written instruction to escrow to pay the commission directly to Courtney" — there would have been "no violation of the Business and Professions Code."

13

B.  *Substantial Evidence Edgerton Failed To Supervise*

Courtney's arguments fail, both as a factual and legal matter.  There is substantial evidence Edgerton failed to supervise Courtney.  Even the most cursory review of the standard offer, agreement and escrow instructions would have revealed "Excalibur Commercial" as the named broker.  The name "Excalibur" is typed in the form contract in two separate conspicuous places, including the signature block on the last page.  Edgerton's sole function was to be Courtney's broker.  Edgerton's failure to even notice Excalibur's name in the sales documents strongly suggests he did not review the documents in any meaningful way.  Indeed, Courtney and Edgerton structured their relationship to give Edgerton a disincentive to do any work on the transaction by paying him nothing and having Courtney "fully" indemnify Edgerton "for all activities."

Courtney is correct, of course, that *if* Edgerton had interlineated his name as broker, or *if* Edgerton had properly prepared a fictitious business name statement, or *if* any number of other speculative events had occurred, the commission contract might have been lawful.  However, ifs and buts are no basis for relief.   The law is wisely skeptical of claims that in reality are little more than wishful thinking.

C.  *The Trial Court Properly Ordered Disgorgement of Commission Based on Courtney's Breach of Fiduciary Duty*

The court properly ordered disgorgement of the $60,000 commission for breach of fiduciary duty.  "The law imposes on a real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary.'"  (*Batson v. Strehlow* (1968) 68 Cal.2d 662, 674.)  "The Legislature intended to ensure that real estate

14

brokers and salespersons will be honest, truthful and worthy of the fiduciary responsibilities which they will bear." (*Harrington v. Department of Real Estate* (1989) 214 Cal.App.3d 394, 402.)

Here, the court found Courtney breached his fiduciary duties "by engaging in the actions" of obtaining a commission under an unlawful contract and altering the trust deed after it was notarized. This finding supports the portion of the judgment ordering Courtney to disgorge the commission paid.

*Sierra Pacific Industries v. Carter* (1980) 104 Cal.App.3d 579 (*Sierra Pacific*) is instructive. There, a real estate broker sold his client's property to his daughter and son-in-law and was paid a $5,000 commission, but did not inform his client, the seller, of his relationship to the buyers. The *Sierra Pacific* court held the broker breached his fiduciary duty of full disclosure and was required to disgorge the commission paid, "[a]part from any actual and proximately caused loss on the price" the seller received for the property. *(Id.* at pp. 582-583.) The *Sierra Pacific* court stated, "'[B]y misconduct . . . or wilful disregard, in a material respect, of an obligation imposed upon him by the law of agency, he may forfeit his right to compensation.'" (*Id.* at p. 583; see *Menzel v. Salka* (1960) 179 Cal.App.2d 612, 623 [commission disgorged where real estate agent breached fiduciary duties by "competing with his principals concerning the subject matter of the agency" and made secret profits.)

Not all breaches of fiduciary duty deprive a broker of compensation. For example, where the failure to disclose material facts is not intentional but "inadvertent," the commission's forfeiture is not warranted. (*Ziswasser v. Cole & Cowan, Inc.* (1985) 164

Cal.App.3d 417, 425 (*Ziwasser*); see *Tackett v. Croonquist* (1966) 244 Cal.App.2d 572 [misrepresentations negligently made and not with the intent to induce action, held: broker entitled to retain commission].)

In his reply brief, Courtney asserts the *Ziswasser* line of cases controls here because "[i]n this case there were no findings and no evidence of either breach of the duty of loyalty, bad faith or fraud." Courtney's argument ignores the record. Courtney's alteration of the trust deed—by inserting his name as beneficiary after Aliev signed it and after it was notarized—is willful misconduct. Documents do not get altered in this manner by accident. Moreover, Courtney held himself out as a licensed broker operating under the fictitious name, Excalibur, knowing that neither he nor Excalibur were licensed brokers. Additionally, there is substantial evidence Aliev's signature was copied and pasted on the commission agreement from some other document. Although the statement of decision does not use the words "egregious," "bad faith," or "fraud," no magic words are required; the factual determinations in the court's statement of decision speak for themselves, and our review extends to the entire record, and is not limited to facts mentioned in a trial court's statement of decision. (*In re Shaputis*, *supra*, 53 Cal.4th at p. 214, fn. 11; *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1845 ["No 'magic words' are necessary to show an appropriate exercise of discretion."].)

Courtney also contends *Sierra Pacific* is "not well-reasoned" because "it does not analyze how the commission constituted actual damages to Plaintiff." This argument misses the point, because the obligation to make restitution is independent of actual damages. The broker's right to keep a commission already paid depends on faithful

16

completion of his or her agency. Where, as here, the breach is more than merely inadvertent or negligent, but is willful misconduct, the commission is forfeited as a matter of policy, "[a]part from any actual and proximately caused loss . . . ." (*Sierra Pacific, supra,* 104 Cal.App.3d at p. 582.)[8] "The rule is not intended to be remedial of actual wrong, but preventative of the possibility of it." (*Baird v. Madsen* (1943) 57 Cal.App.2d 465, 476.)

D. *The Trial Court Properly Ordered Disgorgement of Commission Because the Commission Agreement Is Unlawful*

"An agreement employing a person to act as a real estate broker who is not licensed as such is illegal, void and unenforceable." (*Estate of Prieto*, *supra,* 243 Cal.App.2d at p. 85.) Nevertheless, Courtney asserts that contracts violating licensing laws do not *necessarily* preclude the broker from obtaining what he would otherwise be entitled to receive. Citing *Venturi & Co. LLC v. Pacific Malibu Development Corp.* (2009) 172 Cal.App.4th 1417, 1425, footnote 5, Courtney observes that statutes applicable to building contractors allow the client of an unlicensed contractor to recover all compensation paid, but statutes pertaining to real estate brokers and salespersons do not. From this, Courtney asserts that even if the contract is unenforceable, Aliev cannot obtain restitution of money he has already paid.

---

8      "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." (Rest.2d Agency § 469.)

17

Courtney also notes Business and Professions Code section 10137, which prohibits a real estate salesperson from accepting compensation from any person other than his or her broker of record, provides an administrative sanction: "For a violation of any of the provisions of this section, the commissioner may temporarily suspend or permanently revoke the license of the real estate licensee . . . ." Courtney concludes, therefore, that courts should not impose any "additional penalties" by refusing to enforce the unlawful contract.

In a related argument, Courtney contends that even if the commission contract is unlawful under Business and Professions Code section 10137, "it should be enforced under the doctrine of substantial compliance."

All of these arguments involve the same underlying issue — whether the commission contract, albeit unlawful, is enforceable at least to the extent Aliev has already performed by paying $60,000 commission. However, it is unnecessary to resolve this question because, as noted above, Courtney's *breaches of fiduciary duty* support the court's order requiring disgorgement of the $60,000 commission, entirely apart from whether the unlawful commission contract is nevertheless enforceable.

In any event, even if we were required to reach the contract issue, as explained below, Courtney's arguments are without merit.

"Normally, courts will not '"lend their aid to the enforcement of an illegal agreement or one against public policy . . . ."' [Citations.] This rule is based on the rationale that 'the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties.'"

18

(*Asdourian v. Araj* (1985) 38 Cal.3d 276, 291 (*Asdourian*), superseded by statute on other grounds as stated in *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 541  (*Kashani*).)

"However, 'the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances. A wide range of exceptions has been recognized.'" (*Asdourian, supra,* 38 Cal.3d at 291.).  In compelling cases, illegal contracts will be enforced to avoid "unjust enrichment" to one party and a disproportionately "harsh penalty" upon the other.  (*Id.* at p. 292.)  "'"In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts."'"  (*Ibid.*)  In sum, "the question of whether a contract is void for violating a statute depends on the particular facts."  (*Schaffter v. Creative Capital Leasing Group, LLC* (2008) 166 Cal.App.4th 745, 756.)

A brief survey of the cases upon which Courtney relies illustrates why the unlawful contract here cannot be enforced, and Aliev is entitled to restitution.

For example, in *Vitek, Inc. v. Alvarado Ice Palace, Inc.* (1973) 34 Cal.App.3d 586, superseded by statute as stated in *Kashani, supra,* 118 Cal.App.4th at page 558, the plaintiff, a contractor, although unlicensed when the contract was executed, was licensed during performance of the work, and performed the work competently.  Under those circumstances, the court concluded, "Nor can it be seriously argued that the statutory purposes of public protection would be frustrated by allowing enforcement of a contract fully performed by a licensed contractor  . . . whose only disability was signing the

19

contract one business day before the license was issued." (*Id.* at pp. 594-595.) In sharp contrast here, neither Courtney nor Excalibur were licensed brokers at any time during this transaction, and Courtney altered documents affecting title.

In *Wilson v. Stearns* (1954) 123 Cal.App.2d 472, the plaintiff broker sold 85 tract homes for the defendant developer under a written commission contract. The defendant repeatedly promised to pay the commission; however, the trial court found the contract unenforceable because it did not contain a "definite, specified date of final and complete termination" as required by Business and Professions Code section 10176, subdivision (f). (*Wilson v. Stearns*, *supra*, 123 Cal.App.2d at pp. 477-478.) The appellate court reversed and enforced the contract because there was "no serious moral turpitude" involved, the recipient of the licensee's services was "guilty of the greatest moral fault," and refusing to enforce the contract would permit him "to be unjustly enriched" at the expense of the other party. (*Id.* at p. 482.)[9]

In contrast here, Courtney falsely posed as Excalibur from inception through close of escrow. Courtney knew he was not a broker. He knew Excalibur was unlicensed. There is substantial evidence Edgerton did nothing, and Courtney, while unsupervised, misled Aliev about the nature of the trust deed, and then altered the trust deed after Aliev signed it and it was notarized. Depriving Courtney of his commission confers no unjust benefit on Aliev. As Aliev's expert explained:

---

[9] *Babcock v. Houston* (1973) 33 Cal.App.3d 858, cited by Courtney, is similar.

"Q: Well, what about the argument that it's just fundamentally unfair for a licensee to go through all this work and do these deals and get this commission money and then be told he has to disgorge it?

"A: Well, you know, as an expert, I have a hard time opining on fairness or unfairness. I can only tell you that I have been doing this work for 30 years. And with all respect to Mr. Courtney and Mr. Edgerton, when they were trained, when they got their license and then when they continued on getting their license, trained by people like me, they were told over and over and over again, if you don't strictly comply, you forfeit the right to a commission in order to protect the public. That's just the way it is."

The other cases cited by Courtney are also significantly distinguishable because they mostly involve minor infractions of licensing laws where forfeiture would result in unjust hardship to the person performing the work. (*Gatti v. Highland Park Builders, Inc.* (1946) 27 Cal.2d 687 [Plaintiffs, each of whom were licensed contractors, form a partnership but fail to obtain a separate license for the partnership. Held: technical failure to obtain an *additional* license does not prevent enforcement of the contract.], superseded by statute as stated in *WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th, 581, 595; *Latipac, Inc. v. Superior Court* (1966) 64 Cal.2d 278, 280-281 [License not promptly renewed because office manager responsible for renewal "suffered an emotional breakdown and subsequent commitment to a mental institution."], superseded by statute as stated in *WSS Industrial, supra,* at p. 595; *Asdourian, supra,* 38 Cal.3d 276 [Plaintiff obtains contractor's license under a fictitious business name, never incorporates the business, and works under his own individual name. Contract enforceable because issuing license in plaintiff's own name would not have provided defendant any greater assurances he was dealing with a

21

competent contractor, or any different information about the solvency of plaintiff's business.  The business entity was precisely the same, the work would have been done by the same persons, supervised by the same person.].)  Two other types of cases cited by Courtney lack any element of wrongdoing in the nature of breach of fiduciary duty. (*Comet Theater Enterprises, Inc. v. Cartwright* (9th Cir. 1952) 195 F.2d 80 [after paying contract price, plaintiff discovers defendant is unlicensed, no breach of fiduciary duty or "moral turpitude" involved]; *Richardson v. Roberts* (1962) 210 Cal.App.2d 603 [commission paid by a licensed broker to an unlicensed person; no breach of fiduciary duty involved].)

Courtney also cites *Montoya v. McLeod* (1985) 176 Cal.App.3d 57 for the proposition that disgorgement is inappropriate even "in the face of obvious fraud and statutory violations . . . ."   However, *Montoya* has nothing to do with commissions, or disgorgement of commissions in the sale of real estate.  The Montoyas, acting on their salesperson's (McLeod's) advice, invested their life savings in an unsecured promissory note where the borrower turned out to be McLeod's employer.   The investment lost 75 percent of its value.  Montoya sued McLeod for resulting damages caused by breach of fiduciary duty.  The Court of Appeal reversed a judgment in favor of McLeod, and remanded for a determination of causation, i.e., whether Montoya reasonably relied on the facts presented, given the nondisclosure that the loan was unlawful.  Whether commissions sho]uld be disgorged for breach of fiduciary duty was not considered in *Montoya*.  "'[C]ases are not authority for propositions not considered.'" (*People v. Avila* (2006) 38 Cal.4th 491, 566.)

22

Courtney has not cited any case remotely similar to the facts here—where an unlicensed "broker" who authored an unlawful commission contract, cut-and-paste signature blocks on a commission agreement, and breached his fiduciary duties by, among other things, altering a trust deed to insert himself as Beneficiary—has not been required to disgorge a paid commission.

Courtney argues there is "no legal or factual reason" to distinguish the $34,500 commission lawfully paid on Aliev's original purchase, and the $60,000 commission the court has now ordered him to disgorge.   But the distinction is obvious: Excalibur was licensed throughout the original purchase transaction and there was no breach of fiduciary duty then.

E. *Substantial Evidence Supports Cancellation of the Trust Deed*

In his opening brief, Courtney argued, "there is no evidence in support of the Court's finding that Courtney altered an original deed of trust after it was notarized before recording it [because] the uncontroverted evidence presented is that there were two original deeds of trust."  However, in his reply brief, Courtney concedes this statement "was in error" and "the determination of the Trial Court that there was only one deed of trust [citation] is supported by substantial evidence."

Nevertheless, Courtney still contends there is no substantial evidence to support the finding he altered the deed of trust.  He asserts there is "no testimony or evidence" the additions to the trust deed were made after the document was notarized.  Courtney concludes, "[t]he most likely scenario of events was that in making a copy to give to

23

Aliev, the notary observed that the document had not been completely filled out in the three minor areas and had same filled out by Courtney in Aliev's presence."

Courtney's own trial testimony belies his appellate argument. Courtney identified exhibit 38 as "a copy of the Deed of Trust before it was recorded." This copy bears Aliev's signature and the notary stamp.

Exhibit 204.7 is a copy of the trust deed as recorded. Comparing the two, it is obvious Courtney added (1) his name and address where the recorded document is to be sent; (2) his name as Beneficiary; and (3) the printing "Otkai Aliev" under Aliev's cursive signature. At trial, Courtney admitted all the handwriting was his and "it looks to me like my name was added . . . ." Courtney had no explanation of how his name was added to the trust deed after Aliev had signed it in the notary's presence.

A reasonable conclusion from these undisputed facts is Courtney altered the trust deed after Aliev signed it and it was notarized, and before it was recorded. Neither Courtney nor Aliev testified that the notary noticed there was data missing and had Courtney alter the document in Aliev's presence.

For the first time in his reply brief, Courtney contends the additions were immaterial and cannot support cancelling the document. He characterizes the absence of his name as beneficiary a "clerical mistake." However, by not raising this argument in his opening brief, Courtney has forfeited the contention. (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115.) In any event, the argument is without merit. Printing Aliev's name under his cursive signature might be considered "immaterial," but adding Courtney's name as beneficiary is a significant alteration. A beneficiary is a

24

necessary party to a deed of trust. (4 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 10:3 ["A deed of trust involves three parties: the trustor, the trustee, and the beneficiary."].)

IV. *Substantial Evidence Supports the Trial Court's Determination that Aliev's Action Is Timely*

A. *Factual Background*

Escrow closed November 19, 2002. The escrow officer prepared a "Seller's Settlement Statement" that in the ordinary course would have been sent to Aliev. The seller's settlement statement shows disbursement of $60,000 by wire transfer for "Listing Broker Commission. It also shows $60,000 as a "Commission Reduction—Excalibur." This, of course, is consistent with Aliev's testimony that the total agreed-upon commission was $60,000.

On May 12, 2003, Courtney faxed and/or mailed a letter to Aliev containing a "summary of what you owe" in the total amount of $106,575.27. By then, Courtney had become involved in another Aliev real estate transaction, this one involving residential property, and which led to other disputes between Aliev and Courtney. In addition to claims based on this new transaction, Courtney included: "Engineer Road: $61,009.61 (Principle [*sic*] of $60,000 plus 3.5% interest . . . .)"

Aliev believed "Courtney had received all the commissions he was due" and "I had confirmation that he had received his $60,000 . . . ." Since escrow had paid Courtney his $60,000 commission, Aliev believed the trust deed would be "destroyed."

25

Courtney did not include a copy of the recorded trust deed in the May 12, 2003 fax/mailing to Aliev.[10]  Aliev recalled seeing only the cover letter.

Aliev did not respond to Courtney's letter.  There were no meetings, no conversations between Aliev and Courtney for the next four years:

> "Q:  . . . So basically, you asked for $106,000, you don't hear from the guy, and you basically go silent for four years?"

> "A:  Yes."

Courtney contends that in May 2007 he sent Aliev a "demand for payment of the Note Secured by Deed of Trust  . . . made November 22, 2002."  However, Aliev denied receiving the letter, stating it was never delivered.

On November 23, 2010, Courtney hand-delivered a letter to Aliev's house, entitled, "DEMAND," stating:  "As you know, you are well past due on your obligation to make the balloon payment on the Note Secured By Deed of Trust . . . ."   The same day, Aliev forwarded the letter to his attorney.

On February 23, 2011, Courtney faxed and mailed to Aliev a package of documents, which Aliev forwarded to his attorney.

On March 11, 2011, Courtney filed a notice of default and election to sell under deed of trust.

Two weeks later, on March 25, 2011, Aliev filed his complaint, and later, on April 4, 2011, his first amended complaint.

---

[10]    Courtney testified to the contrary, but the trial court was entitled to, and did, believe Aliev's testimony.

B.  *The Trial Court's Decision*

Courtney has not included his answer in the clerk's transcript, and therefore it is unclear what statute of limitations issues were cognizable at trial.  In the statement of decision, the court stated, "Defendant admits that there is no statute of limitations governing quiet title actions and more significantly, admits that no statute of limitations runs against a plaintiff seeking to quiet title while he is in possession of the property."  Courtney does not challenge this determination on appeal.[11]

Courtney contends, however, that "no later than May 12, 2003, Aliev was aware that Courtney was claiming an additional $60,000 in commissions from him."  Courtney contends that even applying delayed discovery rules for starting the limitations period, Aliev should have immediately conducted an investigation of Courtney's license status, and therefore any claims for breach of fiduciary duty expired within three years thereafter, or May 2006.

The trial court rejected this argument, finding credible Aliev's testimony that he did not receive a copy of the recorded trust deed until late 2010 or early 2011.  Moreover, before 2010, Courtney was the only one seeking affirmative relief (claiming an additional $60,000 commission was due), and Aliev was not even aware that the trust deed had been altered or even recorded.  Accordingly, the trial court concluded, "[U]nder the circumstances, it would be more logical that Courtney would have filed suit, something he never did."

---

[11]    See *Salazar v. Thomas* (2015) 236 Cal.App.4th 467 for a discussion of this rule.

C. *Substantial Evidence Supports the Court's Decision*

As discussed, Aliev is entitled to restitution of the $60,000 commission under a breach of fiduciary duty theory. The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is fraudulent or nonfraudulent. (See *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 963.) In this case, Aliev concedes the three-year period applies.

"As a general rule, statutes of limitations begin to run once every element of a cause of action has occurred. (*Strasberg v. Odyssey Group* (1996) 51 Cal.App.4th 906, 916.) But this rule does not apply when the putative defendant is in a fiduciary relationship with the putative plaintiff; in that situation, the limitations clock does not begin to tick until 'the [putative plaintiff] has knowledge or notice of the act constituting a breach of fidelity.'" (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 683.) "'Delayed accrual of a cause of action is viewed as particularly appropriate where the relationship between the parties is one of special trust such as that involving a fiduciary, confidential or privileged relationship.'" (*Britton v. Girardi* (2015) 235 Cal.App.4th 721, 734.)[12]

The question of when a plaintiff discovered or reasonably should have discovered the facts for purposes of the statute of limitations is a factual question. (*Gryczman v. 4550 Pico Partners, Ltd.* (2003) 107 Cal.App.4th 1, 7.) We review the trial court's

---

[12]  We reject Courtney's argument, made for the first time in his reply brief, that the delayed discovery rule does not apply because "the findings of breach of fiduciary duty involved sloppiness on the part of Courtney in connection with the transaction." There is no such exception to the delayed discovery rules, and even if there was, Courtney's alterations of the trust deed here is not an instance of "sloppiness."

28

finding under the substantial evidence standard. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We accept as true all evidence tending to support the judgment, including all reasonable inferences from the evidence, and resolve all conflicts in favor of the judgment. (*Ibid.*) We reverse only if the evidence viewed in this light and on the entire record fails to support the judgment as a matter of law. (*Ibid.; Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Substantial evidence supports the court's determination that Aliev's breach of fiduciary action is not time-barred. Courtney's May 2003 letter included an invoice for $106,000, itemizing Aliev's purported obligation to pay for a mixed bag of car wheels, tires, attorney fees, commissions on another real estate transaction, and $61,000 for commission on Engineer Road. *These were Courtney's contract claims for affirmative relief, not Aliev's.* Nothing in the 2003 fax/mailing that Aliev received would reasonably alert Aliev that Courtney had altered a trust deed or had committed any other breach of fiduciary duty. Aliev was first put on notice of his right to affirmative relief (disgorgement of the $60,000 commission paid) when he saw the altered deed of trust. The trial court was entitled to, and did believe Aliev's testimony he first saw the altered trust deed in late 2010 or early 2011. Aliev's lawsuit, filed in early 2011, is therefore timely.

## V. *THE ATTORNEY FEE AWARD IS AFFIRMED*

Courtney contends "any reversal" should result in a reversal of the attorney fee award as well. He makes no other arguments on this issue. Because we affirm the judgment in its entirety, the attorney fee award is also affirmed.

DISPOSITION

The judgment, as amended June 7, 2013, to include dollar amounts for attorney fees and costs is affirmed.  Aliev is entitled to his costs on appeal.


NARES, Acting P. J.

WE CONCUR:


HALLER, J.


IRION, J.